In the matter of the probate of the will of Howard P. Frothingham, deceased.

[Decided December 18th, 1908.]

1. Pencil erasures on the face of a will are as effectual to cancel the portion obliterated as if done with ink.

2. In case of pencil erasures on the face of a will, the question is whether the erasures were intended to be the testator's final act, or whether they were dependent relative revocation, not final; intention with which the marks were made being the test.

3. The presence of pencil marks on the draft of a new will, found in a drawer of testator's desk after his death, is *prima facie* evidence that the marks were made by him, and indicate that he was still in a state of dubiety as to the disposition of his property.

4. That certain gifts made by a testator are inoperative because of his altered circumstances cannot be urged as a reason for holding that erasures on his will were made *animo revocandi.*

5. If a will is shown to have been canceled for the purpose of making a fresh will, the original is not revoked if no fresh will is made.

6. That a testator makes an unnatural will, or allows a will to stand which, by reason of changed circumstances, would be unnatural if made at the particular time, is not a reason for overthrowing it.

7. Irrespective of intention testaments can only be revoked according to the formula prescribed by statute.

On appeal from the Monmouth county orphans court granting probate of the last will and testament of Howard P. Frothingham, deceased.

*Messrs. McDermott & Fisk,* and *Messrs. Bigham & Wagner* (of the New York bar), for the appellants, Meredith S. Frothingham and Grace Bleecker MacSymon.

*Mr. Benjamin P. Morris* and *Mr. Edmund Wilson,* for the respondents, Maud LeGrand Frothingham, Beatrice Maud Frothingham and James P. Dodd.

*Mr. Clinton E. Fisk,* for the respondent, Lillian Low.

WALKER, VICE-ORDINARY.

The Monmouth county orphans court on May 29th, 1907, made an order admitting to probate the last will and testament of Howard P. Frothingham, late of the county of Monmouth, deceased, omitting from the probate thereof, however, the second, third, fourth and fifth clauses of the will, through which lead pencil lines by way of erasure had been drawn by the testator and another in his presence and with his approbation, and which erasures, it was adjudged, were cancellations made by Mr. Frothingham *animo revocandi.*

In the clauses of the will thus erased, and said to have been canceled with intent to revoke the parts of the testament obliterated, Mr. Frothingham made provisions as follows: *Second,* to his daughters, Lillian Low and Beatrice Maud Frothingham, each an annuity of $150 per month for life, and to his sister, Grace Bleecker MacSymon, and his brother, Meredith S. Frothingham, each an annuity of $100 per month for life, such annuities to be a charge against his residuary estate; *third,* to his friend, James P. Dodd, his business of negotiating loans in New York City; *fourth,* to his daughter, Lillian Low, a house and land in East Orange, together with the contents of the house,

and *fifth,* to his wife, Maud LeGrand Frothingham, a house and land in New York City; also a house and grounds at Deal Beach, Monmouth county, and the contents of the house; also his one-half interest in a large tract of land located in the counties of Passaic and Bergen.

The pertinent facts concerning the cancellations referred to are these: James P. Dodd, the person to whom Mr. Frothingham in the third item of his will bequeathed his business, testifies that he was employed by Mr. Frothingham at his office in New York; that a week or so after the will had been executed Mr. Frothingham brought it to the office to put in his safe and it then had no pencil marks upon it. On a day in December, 1906, Mr. Frothingham had a talk with the witness about his financial situation and said to the witness that he had almost no estate left outside of what real estate he had and that he thought he ought to change his will, because he had provided in it for annuities and there was no money out of which to pay them and he was worried about what would become of his wife; he wanted her to get all she could out of the estate which was very little, and he told the witness to call his attention to the matter the next day so he could get the will out of the safe and make the changes. The next day he himself asked for the will and the witness got it out for him and he made the pencil marks upon it in the presence of the witness, with the exception of the marks through the names of the witness and of John Olney and John J. Edwards, which marks were made by the witness in Mr. Frothingham's presence. The word "sold," written in lead pencil on the fifth item of the will, was made by Mr. Frothingham, and the tract so marked sold was in fact sold between the date of the will and the day of the drawing the lead pencil mark to which reference is made. The witness then asked Mr. Frothingham if he wanted him to send the will over to his lawyer, and he said: "No, send it to the man who engrossed it and have him make a draft of it according to the directions." This was done and the draft came back, and there was a clause in it that did not suit Mr. Frothingham and he threw it aside and put the old will in the safe. The new draft he put in his desk; that on the day before the changes were made and during the talk about them

he suggested that inasmuch as Mr. Frothingham thought his family would get hardly anything out of the estate that it would be a good thing to let Mrs. Frothingham share in the business, if he thought there was anything in it; and they also talked about taking his son-in-law in the office, and Mr. Frothingham asked the witness's opinion upon the matter and he told him he thought it would be a very good thing inasmuch as Mr. Frothingham was going away for some time and it probably would be better to have some representative of his family in the office, and he gave the witness instructions to have the business go to Mr. Low instead of to himself as provided in the original will. Mr. Frothingham said nothing about the business on the day the changes were made. It was the day before when they had the long talk that the instructions were given. In pursuance of this conversation the witness, Mr. Dodd, gave the draftsman instructions to substitute the name of Mr. Low for himself in the will.

George J. Ennis testified that he was a clerk for Mr. Frothingham and was present in his office in December, 1906, with Mr. Frothingham and Mr. Dodd, and saw the will on Mr. Frothingham's desk and he saw Mr. Frothingham make the pencil marks on the will and heard him say that he had some changes to make.

The only other persons sworn were the subscribing witnesses to the will, who proved its due execution.

It is settled that pencil erasures made upon the face of a will are as effectual to cancel the portions obliterated as if done with ink. *Hilyard* v. *Wood, 71 N. J. Eq. (1 Buch.) 214.* The question, however, is whether the erasures were intended to be the final act of the testator by way of canceling portions of his will, or whether they were, what is called in the law, dependent relative revocation, which, of course, is not final.

The intention with which the testator makes the marks upon his will is the crucial test as to whether or not cancellation is intended. Vice-Ordinary Bergen, in *Hilyard* v. *Wood, supra* (at *p. 9*), said that the manner in which the erasure is made, whether in ink or pencil, the extent of it, and its effect upon other uncanceled portions of the will, may prevent the presumption of finality. Now, in the case under consideration, if it be conceded

that omitting the parts of the will said to have been canceled does not render the remaining portions ambiguous (which is true assuming the testator meant to cancel the last line of the second item which is untouched by the pencil mark), the other tests as to finality, namely, the manner in which the erasures were made, and the extent of them, certainly make against the presumption of finality. Especially is this so, when the acts of the testator are considered in conjunction with his declarations.

Let me say at this juncture that in *Hilyard* v. *Wood, supra,* the character of the erasures made upon the will were such as to lead most strongly to the conclusion that the act was deliberate on the part of the testator and made with intent to obliterate the portions marked, for there were three or more lines drawn through each part of the will intended to be eliminated. Not so in the case of the will under consideration.

In the will of Mr. Frothingham the second item is composed of seventeen lines on the first page and one line on the second page. Through the seventeen lines on the first page are drawn two pencil marks obliquely crossing each other, while the eighteenth line of the second item, which is the first line on the second page, is without cancellation. Through the third item, in which the bequest of his business is made by Mr. Frothingham to his friend, Mr. Dodd, is drawn a single and practically vertical lead pencil mark through the first fourteen lines, leaving two lines at the conclusion of the item untouched by the vertical mark. These two lines are canceled by four oblique lines running through portions of them, two of which extend up into the body above. My reading of the testimony leads me to believe that the mark made by the testator upon this third item is the single vertical pencil mark to which I have referred. The testimony of the witness, Dodd, is somewhat ambiguous upon this point. He says that Mr. Frothingham made all of the pencil erasures with the exception of the mark through his own name in the second line of the third item, and, to use his own language, "the mark through 'James P. Dodd' was made by myself in his presence. The mark through 'John Olney' and 'John J. Edwards' was also made by me in his presence." In the answer from which the foregoing is quoted he mentions obliterating his

14

own name twice, and in the testimony thus literally copied I take it that his mention of his name refers to the second time his name appears in that item. It should be stated in this connection that the vertical pencil mark through the third item runs through the initial letters of the names of Dodd and Edwards. This line was drawn by the testator unless he stopped above the fifth line from the end of the item, in which event that line was continued by the witness Dodd. An inspection of the line both with the naked eye and under the microscope clearly indicates that it is a continuous line drawn by the same hand at the same time, and, if it were efficacious to cancel all parts of the item through which it was drawn; or, for that matter, the whole item, the names of James P. Dodd, John Olney and John J. Edwards were effectually canceled by that mark. Now, if Mr. Dodd drew the lines through his own name and the names of Olney and Edwards, he did it by making a practically horizontal line through his own name in both places where it occurs in the item, and by drawing an oblique line through the name of John J. Edwards, which line extends for a considerable distance through the item, and by drawing several other irregular lines through the end of the item where the three names occur. The following is a copy of the third item, line for line, with straight marks in ink drawn through it, which marks closely approximate the pencil marks upon the face of the item :

(Page 2.)

THIRD.—I give and bequeath to my

friend ~~JAMES P. DODD~~ my business

of negotiating time and call loans, established in 1881, conducted at No. 2 Wall Street, New York City, including my furniture and furnishings connected therewith, and I authorize him to continue the said business and direct that the income derived therefrom shall go to him absolutely and in his own right. It ~~is my wish and~~ hereby request the ~~said James P. Dodd~~ to retain JOHN ~~OLNEY and JOHN J. EDWARDS now~~ in my employ in their present position so long as they shall faithfully discharge the duties appertaining thereto.—

The fourth item is obliterated by an oblique pencil mark drawn entirely through the item, as shown approximately in the subjoined copy of that item, marked in ink:

(Page 2.)

FOURTH.   I give, devise and bequeath to my beloved daughter LILLIAN LOW, the house and land known and designated as No. 84 Carleton Street, East Orange, New Jersey, together with all the contents of said house absolutely and in her own right.—

The fifth item was canceled by vertical pencil marks drawn clear through the item from top to bottom, and in that item, in the last paragraph, in addition to the vertical pencil line the word "sold" is written in pencil, so that some part of the pencil-writing extends over the last four lines of the item, which is a bequest to the testator's wife of a half interest in a tract of land located in Passaic and Bergen counties, in this state. The following is a copy of the fifth item, showing approximately how it is marked:

(Page 2.)

FIFTH:—I give, devise and bequeath to my beloved and devoted wife MAUD LE GRAND FROTHINGHAM, the house and land known and designated as No. 20 West

(Page 3.)

77th Street New York City, and all the contents in said house, and also the house and grounds located on Milan Place Stratford Place, Surf Lane and Deal Esplanade, at Deal Beach, Monmouth County, New Jersey, and all the contents of said house, absolutely and in her own right.

I also give devise and bequeath to my said wife my one-half (1/2) interest in the Le Grand Lake tract of land consisting of Twenty-one Hundred (2100) acres located in the counties of Passaic and Bergen in the State of New Jersey, the other half interest being owned by Pliny Fisk of New York City.—

Mr. Frothingham was undoubtedly a man of affairs and one who seems to have been precise about the form in which his will should exist. He appeared to be unwilling that his testamentary acts should repose in any poorly written or even typewritten form, but had his will engrossed by one who was a professional scrivener, a man who wrote what is called a "court hand." After the emendations referred to were made upon the face of his will, he directed Mr. Dodd to take it to the man who engrossed it, and to use his own language, "have him (the scrivener) make a draft of it according to the directions." "Make a draft of it," to my mind, means make a draft of a will for execution by the testator. The "directions" referred to could be nothing more than the erasures upon the face of the will plus the verbal declarations of Mr. Frothingham to Mr. Dodd. It is a singular thing that upon receiving the will with the marks of cancellation upon it and hearing the verbal directions from Mr. Dodd, the scrivener should have made a new draft containing as the third item, a devise and bequest to the testator's daughter, Mrs. Low, of the house and its contents which were devised and bequeathed to her in the fourth item of the original will, and through the entirety of which item in the original will a lead pencil mark was obliquely drawn. What occurred then was this: The will with the obliterations upon it was sent to the scrivener with request to make a new draft according to directions, and the directions, aside from those that the marked will would naturally indicate, were disclosed by Mr. Dodd, and the draft of a new will, when sent over to Mr. Frothingham, gave the business to Mr. Low and the house, No. 84 Carleton street, East Orange, to Mrs. Low, coupled with a devise and bequest of all the testator's residuary estate to his wife, whom he appointed his executrix, with power of sale of his real estate. Mr. Dodd says that when the draft came back there was a clause in it that did not suit Mr. Frothingham, and that he threw it aside and put the old will in the safe, and the draft was found after his death in a drawer in his desk, with erasures upon it made by lead pencil marks. The lead pencil marks on this draft are drawn practically perpendicularly through the first, second and third items. The first item directs his executrix to pay his debts; the second

bequeaths the business to his son-in-law, Low, and the third devises and bequeaths the house and contents to his daughter, Mrs. Low. One line of the third item is left untouched on the second page, and the fourth item is a gift of the residue of his estate to his wife; the fifth authorizes the executrix to sell real estate, and the sixth constitutes his wife executrix. Mr. Dodd says that one clause in the draft did not suit Mr. Frothingham; which one we are not informed, but when the draft is produced we find three items erased.

Let us look again at the language used by the testator at the time he made the pencil marks upon his will. Mr. Dodd says that in a conversation with him the testator said that he had almost no estate left, and thought he ought to change his will, and asked the witness to call his attention to the matter the next day so he could get the will out of the safe and make the changes. These expressions read, in connection with the testator's direction to the witness, to take the will to the scrivener to make a new draft according to directions, one direction admittedly being that the third item, which was more effectually canceled by pencil marks than any of the other provisions, should be incorporated into the new draft, leads my mind to the conclusion that the pencil marks upon the will were not made *animo revocandi,* but were made as a guide and by way of instruction to the scrivener, concerning the drawing of a new will which the testator proposed to execute in substitution for the one upon which he had made the marks. My judgment is that there was a verbal direction given to the scrivener which Mr. Dodd forgot to tell about when he was examined as a witness, and that was concerning the fourth item of the original will which devised and bequeathed a house and lot to Mrs. Low. Although effectually canceled by a lead pencil mark, if canceled at all, this item appears in the new draft as item third. In my opinion, the scrivener was instructed by Mr. Dodd to rewrite this item into the new draft or it would not have appeared in it. Without directions to incorporate that item in the new draft, the scrivener could hardly have made the mistake of renumbering and rewriting it, for, as he copied it word for word and line for line from the old will into the new draft, his eyes would have beheld at every glance

the mark of obliteration. He must have been instructed to re-write that item notwithstanding the erasure. I am aware that there is no direct testimony to the effect that the testator sent word to the scrivener to re-embody the fourth item of the will into the draft notwithstanding the pencil erasure mark upon it, but it is reasonably to be presumed that such instruction was sent. In no other way can I account for the presence of item three in the new draft.

It is perfectly obvious that the testator again determined upon changes, for the draft of a new will when produced shows an obliteration by the same character of marks across the bequest of his business to his son-in-law and the gift of a house and its contents to his daughter, as appears on the original will. The draft being found in the drawer of his desk after his death with the pencil marks upon it, is *prima facie* evidence that the marks were made by him (*Hilyard* v. *Wood, ubi supra*), and would in-dicate that he was still in a state of dubiety as to what disposi-tion he would make of his property.

If anything were wanting to show the inconclusive character of the marks made upon the face of the original will it is sup-plied by the testimony of Mr. Dodd, who said that the will was to be redrawn on the lines as he had proposed to make the changes and as indicated by the lead pencil marks, and those lead pencil marks were for the instruction of the draftsman as well as the ones put on by him. Now, according to this testimony, the tes-tator did not change, but proposed to make changes in his will, and the pencil marks made both by the testator and the witness were intended for the draftsman; and those pencil marks, and nothing more, would have indicated that the draftsman was to omit entirely from the new draft the third item which contained a bequest of the business, but, when the draft came back, it con-tained the clause giving the business to Mr. Low instead of Mr. Dodd, just as Mr. Dodd says Mr. Frothingham intended. This shows conclusively that that intent, with reference to the second item, was to be gathered from the pencil marks plus the verbal instructions, and, therefore, there was no cancellation of the second item by the drawing of the pencil marks upon it because

of a want of intent on the part of the testator thereby to revoke that portion of his will.

The testimony shows that the tract in Passaic and Bergen counties, devised to his wife, had been sold by the testator between the date of making his will and the time of making the lead pencil marks upon it. The testimony does not disclose any sale of the property in East Orange, which he bequeathed to his daughter. The learned judge in the court below stated that although not in proof it was stated by counsel at the hearing that the real estate devised by the testator to his daughter, Lillian Low, in the fourth item of his will, and to his wife in the fifth item of his will, had been sold prior to making the pencil marks in December. If this be so it is somewhat singular that he should have written the word "sold" only upon the description of the tract in the counties of Passaic and Bergen, and not upon the description of the house and land on West Seventy-seventh street, New York, and the house and land at Deal Beach, New Jersey, which tracts he devised to his wife in the fifth item, and that he should not have so written the word "sold" upon the description of the East Orange property given to his daughter. In other words, if all of these properties had been sold at the time he made the pencil marks upon the will, and if the word "sold" was written with any idea of significance at all, it would seem that it would have been written upon the descriptions of all the properties similarly situated. Surely, the word "sold" written alone across the description of one of the properties would indicate that it alone had been sold and the rest still remained to the testator. Assuming that the statement of counsel just adverted to has the same force as evidence, the facts stated can have no controlling effect. On this score, the remarks of Skillman, surrogate, *In the matter of Raisbeck, 52 N. Y. Misc. 279* (at *p. 284*), are pertinent. He said that some point was made that certain provisions of the paper propounded as a will in that case were invalid, and that others were impossible of execution, but he remarked that with those questions he had no concern when dealing with the sole question as to what was in the testator's mind when he made the pencil marks upon the will. The application of this observation is, that although certain gifts made by Mr.

Frothingham are inoperative because of his altered circumstances, that cannot be urged as a reason for holding that the erasures on his will were made *animo revocandi*. I do not say that the fact cannot be considered with other facts as indicative of such intention, but I do say that, standing alone, it is entirely without controlling effect.

Now, as the new draft contained a devise of the East Orange house to his daughter, the same as in the original will, it may be that the reason the testator drew the pencil mark through that item of the new draft was that he had sold the East Orange property between the date of making erasures upon the face of the original will and his examination of the new draft. In the absence of a precise statement by counsel giving the dates of the sales of his various tracts of land by the testator, and the exact dates of the markings upon the original will and upon the new draft, it may be presumed that the sale of the East Orange property was effected during the interval just mentioned.

*In the matter of the will of Kirkpatrick, 22 N. J. Eq. (7 C. E. Gr.) 463,* two legacies were canceled by lines drawn by the pen across and upon the words. Besides this there were memoranda in the margin, one opposite each canceled part signed by the testatrix in the one case and by her initials in the other, stating she wished to erase those parts. The canceling was clearly done by her, and there was no evidence to overcome the presumption that the cancellations were made *animo revocandi*.

In *Theob. Wills (6th ed.) 44,* it is laid down that if a will is shown to have been canceled for the purpose of making a fresh will, the original will is not revoked if no fresh will is made.

*In the goods of Appelbee, 1 Hagg. Ec. 143,* the deceased delivered his will to his executor and requested him to make certain alterations in it which he did in pencil, drawing it through the signature at the bottom of the will. The deceased expressed his approbation of the alterations and said he would make a copy of the instrument and execute it. He afterwards wrote a paper in substance the same as the will, but did not execute it. The court held that the signature on the will being struck through was to be regarded as preparatory to the deceased making a new will, which he did not do, and that must be construed as only a

conditional cancellation, and consequently not a revocation. If, as held in the case just mentioned, the cancellation of an entire will will not be established when the signature of the testator is struck out, because the cancellation was only done with a view to the substitution of a new testament to be executed, then, surely, the striking out of only parts of a will made with the same intention to substitute for the document a new testament will not, in the absence of the execution of such new testament, operate as a revocation of the parts of the will which are thus tentatively canceled.

In *Powell* v. *Powell, 14 L. T. Rep. 800,* the question was whether a will made in 1862 was revived by the destruction of a will made in 1864, which revoked the first one. The deceased intended by the destruction of the second will to revive the first, but the second will was probated, as it was revoked only with intent to revive the first, which it was inefficacious to do. A draft of the second will was admitted to probate as and for the testament which had been destroyed. Speaking to the doctrine of dependent relative revocation, the court said that if the act of destruction be done with the sole intention of setting up and establishing some other testamentary paper for which the destruction of the paper in question was only designed to make way, it was clear that in such case the *animo revocandi* had only a conditional existence, the condition being the validity of the paper intended to be substituted. Upon principle the doctrine of this case is pertinently applicable to the case in hand, for, just as surely as a prior will is not revoked by the destruction of a later will which in terms revokes the first one, erasures made upon the face of an existing will when made with a view to the execution of a new testament to give effect to the intentions of the testator as expressed in the original will modified to the extent of the erasures made, will not operate as a cancellation of the clauses in the will thus obliterated, and especially is this so when, as in this case, the erasures upon the will do not discover all of the testator's intentions with reference to alterations, part of which reside in parol instructions to the scrivener.

The case under consideration, as I view it, is essentially a fact case. There can be no doubt but that revocation can be made of

part of a will or of an entire will by lead pencil erasures made upon its face *animo revocandi*. Every case of a will thus obliterated in whole or in part must be determined upon the facts of that case as to the intention with which the marks were made.

The learned judge in the court below lays great stress upon the fact that the testator realized that he had sustained great losses since the execution of his will and had provided for annuities which his estate could not pay, and was naturally worried about what would become of his wife and wanted her to have all she could get out of the estate. The condition of the testator at the time of making the erasures on his will was such as undoubtedly impelled him to change his testament so as effectually to protect his wife to the extent that his estate would protect her, but, in order to do what he intended, his intention must have been given expression according to the forms of law. That a man makes an unnatural will, or allows a will to stand which, by reason of changed circumstances, would be an unnatural one if made at the particular time, is not a reason to overthrow the testament. Hundreds of men fail, through neglect, to alter wills, as their own circumstances and those of the natural objects of their bounty undergo a change, and thousands of men, for the same reason, entirely fail to make wills at all when every sense of duty and responsibility indicate that they should do so. We have a statute known as the statute of wills, and testaments can only be validly made according to the formula prescribed by that statute, and those testaments when made can only be revoked according to the provision of that statute. Failing either in the due execution or revocation of testaments, the act of the deceased, no matter how well intended, fails utterly to accomplish his purpose.

Convinced that the testator intended to change his will, but equally convinced that he never carried his intention into effect, I am constrained to hold that the order of the Monmouth county orphans court admitting the will to probate in an abbreviated form should be modified, and that court directed to admit the will to probate in its entirety. This leads to a reversal. The costs of all parties will be ordered to be paid out of the estate.