This appeal is from a decree of the Prerogative Court granting probate to a certain will dated November 21st, 1932, made by the decedent, Mary Elizabeth Davis. The decree under review reversed a decree of the Bergen County Orphans Court which denied probate of the will. The instrument in question devised and bequeathed the entire estate to William Z. Earle, a nephew, and Anna, his wife, and appointed the Rutherford Trust Company executor. The will, upon execution, was lodged with that Trust Company where it remained until after the death of the testatrix. Later the testatrix made two other wills, one on January 8th, 1934, which designated Helen F. Heise, a niece, as sole beneficiary and nominated the Hackensack Trust Company executor. This *Page 395 
will was left in the custody of the Hackensack Trust Company until April 5th, 1935, when it was delivered to Mrs. Heise on the written order of the testatrix. It was used as a model to prepare the third will and was virtually a reproduction of it save that the niece, Mrs. Heise, was appointed executrix instead of the executor which had been nominated in the second will. Counsel who prepared the third will testified that it contained a clause "revoking all previous wills, codicils or other testamentary dispositions at any time theretofore made." And this is not disputed. Upon the execution of the third will some time in April, 1935, counsel who prepared it gave it over to the testatrix in an envelope which he sealed, together with the second will. He instructed her to destroy the second will. The testatrix at this juncture asked counsel, Donald M. Waesche, if he was "sure the new will revoked all previous wills" and he advised her that it did. The third will was retained by the testatrix personally and placed with other papers and valuable records, such as stock certificates, tax receipts and the like, in a metal box which the testatrix kept in her bedroom under a dresser. She and her niece, Mrs. Heise, had access to this box. After the death of Mrs. Davis on October 13th, 1936, the third will could not be found. Mrs. Heise, executrix and beneficiary, attempted to establish the instrument last made as a lost will. Her effort was unsuccessful. Cf. In re Davis, 127 N.J. Eq. 55.
This court held that under the circumstances, the will having last been seen in the custody of the testatrix and retained by her in a receptacle to which she had full and continuous access, the fact that it could not be found after her death raised a presumption of fact that the testatrix had destroyed the instrument, animo revocandi, and that the evidence offered to rebut that fact presumption was not of the clear, satisfactory and convincing character which was indispensable to establish the missing instrument as a lost will.
Meanwhile, on the eleventh day after the death of the testatrix the Rutherford Trust Company offered the first will for probate and it was admitted by the surrogate. On appeal, Judge Weber, in the Orphans Court, reversed the order of the surrogate and held that when the third will, revoking all *Page 396 
previous wills was executed, the first will was annulled and that when the testatrix destroyed the last will, as presumably she did, it was not her intention to revive the will first made although it was still in existence. On appeal, the Prerogative Court reversed the Orphans Court and reinstated the order of the surrogate admitting the said will to probate. The learned Vice-Ordinary held that since the last will was itself revoked, the revocation thereof annulled the instrument in all its parts; that the revoking clause, being ambulatory and testamentary in character, never had any effect upon the first will and that the first will was therefore unimpaired, relying on Randall v.Beatty (a Prerogative Court case), 31 N.J. Eq. 643, 646.
Before considering the meritorious issue, the appellants have raised a question on the adjective side which should first have attention. The contention is that the Prerogative Court was without jurisdiction to entertain the appeal from the decree of the Orphans Court "respecting the probate of a will" because it was not taken within thirty days, the period prescribed by the statute, R.S. 2:31-93 and 94. It appears that the decree of the Bergen County Orphans Court was filed on January 13th, 1941, and that the notice of appeal by Anna P. Earle et al., to the Prerogative Court was not filed until February 14th, 1941. Mrs. Heise therefore moved to dismiss the appeal in the Prerogative Court. The Vice-Ordinary overruled the motion. It serves no useful purpose to narrate the facts and circumstances of the misadventure that entitled counsel for Mrs. Earle to relief from a rigid enforcement of the rule. The court's order denying the motion to dismiss was wise and equitable and well within the limitations stated by this court in the case of In re Casey,127 N.J. Eq. 101, where a lucid exposition of the powers of the Prerogative Court to grant the relief allowed in this instance may be found. There is therefore no merit to the first point made by the appellants.
On the main question it is argued by the appellants that the 1932 will is not the decedent's last will and testament; that it had been conclusively revoked by the 1935 will; that having been revoked it had not been revived. *Page 397 
The argument to support the proposition that the first will was revoked completely and never revived is rested on section 2 of our Statute on Wills, Comp. Stat. p. 5861 (Rev. 1877 p. 1243) and section 25, Comp. Stat. p. 5870 (Rev. 1877 p. 1248, a supp. 1851, sec. 2). The testatrix in this case died on October 13th, 1936, hence the law as it was then written is controlling. Our revision of 1937 had not been enacted. The statute first referred to, i.e., section 2 of our Wills Act, is closely patterned after the English Statute of Frauds, 29 Charles II, c.3 § 6 (Cf. Jarman on Wills (5th Am. ed.) 282). The supplement of 1851 (Cf. P.L. 1851 p. 218) seems to be patterned in part after section XX of the English statute 1 Victoria 26
(1837). Those sections read thus:
"2. That no devise or bequest in writing, of any lands, tenements, hereditaments or other estates whatsoever in this statute, or of any estate pur auter vie, or any clause thereof, shall be revocable, otherwise than by some other will or codicil in writing, or other writing declaring the same, or by burning, canceling, tearing or obliterating the same by the testator himself or in his presence, and by his direction and consent; but all devises and bequests of any lands, tenements, hereditaments, or other estates whatsoever in this state, or of any estate purauter vie, shall remain and continue in force until the same be burnt, canceled, torn or obliterated by the testator or by his directions in manner aforesaid, or unless the same be revoked or altered by some other will or codicil in writing, or other writing of the devisor signed in the presence of three or more subscribing witnesses declaring such revocation or alteration." (Rev. 1877 p. 1243.)
"25. Sec. 2. That all written revocations of wills shall be executed in the same manner as wills are hereby required to be executed, and when so made shall be sufficient to revoke any last will, or any part thereof." (Rev. 1877 p. 1248.)
The second section, supra, prescribed the statute formula for revocation of devises and provided that three or more witnesses be present. By the supplement of 1851, section I, provision was made for the effective execution of a will before two witnesses and in section II of the supplement, that written revocations of wills shall be executed in the same manner that wills are required to be executed.
It is urged by the appellants that the words in the twenty-fifth section of our Wills Act (section II of the supplement, supra) referring to revocations, "when so made shall be sufficient *Page 398 
to revoke any last will * * *" mean that the legislature ordained that simultaneously with the execution of a revocation, the prior will was completely annulled. We cannot accept this construction. We think that the words "when so made" were intended to indicate, not time, but manner. It is true that the adverb "when" is generally intended as synonymous with "at the time that," c., and usually regarded as a corelative of the word "then." But in the text of the supplement (see section 1, P.L. 1851; Comp.Stat. p. 5867 § 24) the burden of the statutory direction is concerned with the manner of executing wills. The idea of "manner" is likewise intended by the succeeding section of the supplement and to attribute to the words "when so made * * *" the significance of time is to import a meaning to these words at variance with the context of the statute. Just as the second section of our Statute on Wills, supra, followed the sixth section of the English Statute of Frauds, so the Victorian statute, supra, had its effect on the subsequent statute law of this state and most of the other states as well. For instance, section 24 of our Wills Act (section I, 1851 Supp.), is patterned after section IX of the Victorian statute and section 25 (section II, 1851 Supp.) is in part taken from section XX of the English statute. The provision of the Victorian statute concerning revocations once made is that "no will or codicil * * * which shall be in any manner revoked, shall be revived otherwise than by the republication thereof or by a codicil executed in manner hereinbefore required and showing an intention to revive the same." It is significant that this legislation did not fix the time at which revocation took place although the courts of England, as early as 1843, held that revocation dated from the execution of the later instrument (Page on Wills, §474; Major v. Williams, 3 Curt. Ecc. 432; James v. Cohen, Id.770; Brown v. Brown, 8 El. Bl. 875). Since our supplementary act of 1851 did not adopt the requirement of republication of a prior will after a revocation thereof in order to revive the prior will, as provided in the Victorian statute, it is scarcely reasonable to conclude that the legislature intended by using the words "when so made shall be sufficient to *Page 399 
revoke * * *" that an instantaneous and final annulment of such prior will should thereby be accomplished and that it omitted the means provided in the English statute for the re-establishment of the will thus revoked if the testator so desired.
All this is prefatory to the argument of the appellants that since, by our Constitution of 1844 (article X, section 1), it is provided that "The common law and statute laws now in force, not repugnant to this constitution shall remain in force until they expire by their own limitation or be altered or repealed by the legislature * * *, therefore the question before us, an open one in this court, should be controlled by the common law, including the statute of Victoria, supra, "which consolidated and restated the unwritten law of England" on the matter, which common law included the rulings of the ecclesiastical courts. As against this the respondents argue that the Victorian statute is no part of the law of this state nor is the rule of the ecclesiastical courts a part of the common law.
This raises an interesting question but it is not necessary to inquire into it except in passing, first, because we have enacted our own law on the matter after the enactment of the Victorian statute of 1837 (e.g., Supp. of 1851) in which we have adopted certain parts of the English statute and deliberately omitted others and, second, in the cases to which reference will be made it is manifest that our courts while seeming to have been impelled to follow the so-called common law rule of Lord Mansfield have in fact so enmeshed their reasoning with the rule enunciated by the ecclesiastical courts in probate matters that it has resulted in a tacit vindication of the later rule. And the result has not been unduly inharmonious.
The divergence of rule arose in these separate courts in the admission to probate of instruments that were quite different, viz., a will and a testament.
In early days there was a real difference betwen a will and a testament. By the former, real property was devised; by the latter, personal property was bequeathed and it might be done by an informal instrument which could be revoked *Page 400 
informally — see Page on Wills (3d ed.) 762; In re Lester'sWill, 100 N.J. Eq. 521; Williams v. Miles, 62 Neb. 463;62 L.R.A. 383. The jurisdiction of the ecclesiastical courts arose or was bestowed by statute probably in the twelfth century. Legal historians are not in accord as to the time or manner of the acquisition of jurisdiction. It probably began in certain districts, developed into custom and was later clarified and defined by statute. (For a history of the development of probate practice and administration generally from the rules formulated by the ecclesiastical courts see 2 Pollock Maitland, Historyof English Law 333; 2 Fordham Law Review 43.) The distinction between will and testament was abolished in England. 7 WilliamIV and 1 Vict. c. 26. It has also been abolished in our own country. Bringle v. Tucker, 114 Md. 597; 80 Atl. Rep. 224.
The ecclesiastical courts were concerned with "uncontentious" cases and had to do for the most part with probate, administration, inventories, and the like. The common law courts, in the matter of probate of wills, as distinguished from testaments, where a question of revocation was involved, followed a rule laid down by Lord Mansfield to this effect: where real property was devised by will and a subsequent will was executed, expressly or impliedly revoking the first, and if at the death of the testator the subsequent or revoking will had been destroyed, canceled or could not be found and the original will remained, it was admitted to probate. This rule of law, logical if one admits that a revocation is testamentary in character, was first enunciated in the case of Goodright v. Glazier, 4 Burr. 2512.
In contrast to this rule the ecclesiastical courts, having to do with wills or testaments wherein personalty was bequeathed, held that in a like situation the court's inquiry should be to ascertain the intention of the testator. This rule was enunciated in a leading case in ecclesiastical reports — Usticke v.Bawden, 2 Addams Ecc. Rep. 116. It is stated thus: "The legal presumption is neither adverse to nor in favor of the revival of a former uncanceled, upon the cancellation of a later revocatory, will. Having furnished this principle the law withdraws altogether and leaves the question as one of intention purely and open *Page 401 
to a decision either way, solely according to the facts and circumstances."
It is asserted by the respondents that the common law rule should control in this case, i.e., that the destruction of the last will animo revocandi revived the will first made. It may not be amiss to point out, in the interest of accuracy, that since the reason of the common law rule rests on the premise that the revocatory clause of the second will is ambulatory and effective only on the death of the testator, and since it was destroyed by the testator, it never took effect for any purpose. This being so, it is a misapplication of terms to say that the first will was revived when in theory it had never been annulled.
That the Mansfield rule was not favored by the English courts or the bar generally is manifest from the passage of the Victorian statute, supra, which runs counter to the common law rule and expressly negatives the theory of re-establishing a will once revoked, without more. From that time until the present the law in the United States, generally, has leaned toward the view that the actual intent of the testator is to be sought in each case. (See Professor Joseph Warren's article, 33 Harvard LawReview 341, 356; see note 21 Yale Law Journal 672.) A goodly number of the states of the nation have passed statutes similar to the statute of Victoria while those which adhere to the common law rule are decidedly in the minority (Page, Wills, § 475).
Both parties to this appeal argue that our statutes, supra, should be considered in the light of the common law and the English statute law which we have adopted. They differ, however, on the scope of this adopted law — the appellant contending that it embraced the common law as well as the Victoria statute and the pertinent rule of the ecclesiastical courts on the subject of revocation; the respondent that the decisions of the common law courts are controlling and that neither the opinion law of the ecclesiastical courts nor the Victoria statute are parts thereof. The common law is described by Blackstone as the unwritten law (lex non scripta) as distinguished from the written or statute law (lex scripta), i.e., enacted law. That eminent authority *Page 402 
says that the term included not only general but particular customs of certain parts of the kingdom and likewise those particular laws that are by custom observed only in certain courts and jurisdictions (Jones' Blackstone 107), and Kent says it includes "those principles, usages and rules of action applicable to the government and security of persons and property, which do not rest for their authority upon any express or positive declaration of the will of the legislature." (Kent'sComm. 471.) These definitions make manifest that the decisions of the ecclesiastical courts, as such, are to be included as common law sources. If this be so, to what extent are we bound by common law sources? Is the common law as set forth in the decisions of judges to be an inflexible mould and pattern for our judicial opinion in this state? Neither this nor any other state has felt so restrained.
A recent and convincing example is the case of Loudon v.Loudon, 114 N.J. Eq. 242. In that case this court turned away from the common law rule and rested its decision on a principle that we considered more equitable. The common law consists of judicial opinions and as such they are only "evidence of what is common law;" the law and the opinions of the judges are not always convertible terms (Jones' Blackstone 122). Our constitution does not obligate the courts of this state to follow or adopt the reasoning and decisions of the English common law courts. It is the principles of the common law which we in common with most of the states have adopted generally, and not necessarily the decisions of the English courts in exposition of the common law. In the cited Nebraska case (Williams v. Miles,supra) the correct principle is admirably stated by Judge Pound in these words: "If, as between the rule of the old common law courts and the rule of the English ecclesiastical courts, we are not required * * * to follow the former, we think the latter, on principle, greatly to be preferred; and it has the support of the weight of recent authority in America," and "* * * the strong tendency in the United States is to follow the rule of the English ecclesiastical courts, and hold that, if the testator destroys a subsequent will, revoking a former one either expressly or by implication, such act, of itself, will not *Page 403 
revive the former will. Re Gould, 72 Vt. 316; 47 Atl. Rep. 1082;McClure v. McClure, 86 Tenn. 173; Harwell v. Lively,30 Ga. 315; 76 Am. Dec. 649; Bohanon v. Walcot, 1 How. (Miss.)336."
An examination of our cases will reveal that in the circumstance that a testator destroys a will, which revoked a former will, such act, standing alone, is not sufficient to re-establish the former will.
An analysis of those cases compels the conclusion that the doctrine of the ecclesiastical courts, that the intention of the testator in revoking the subsequent will must be ascertained, has been followed.
Chancellor Vroom in 1831 (prior to the Victoria statute of 1837), sitting as Ordinary, in Day v. Day, 3 N.J. Eq. 549,557, held that where a later will revoked a former one and both were improperly destroyed, the contents of the first instrument should not be established as the testator's will even though the contents of the second will could not be ascertained. In this case the widow of the decedent sought to have a will first made admitted to probate and had filed a caveat against a second will. The second will was denied probate because the testator had neither read the will himself nor had it been read to him and there was not proof that this last will was a true copy of an intermediate will in which the draftsman made a mistake. The last will, however, was executed by the testator according to the formula prescribed by the statute and it was proved to have contained an implied revocation of the prior will prepared by a Dr. Camp. Neither will was admitted to probate. The court held that even though the second will failed of probate it was a perfect revocation of the Camp will and was intended to be so by the testator. The court said: "There is no evidence that he ever intended to restore it."
A will is by its very nature revocable. To effect a revocation there must be a present intent to do so and whether the revocation be contained in another will or a codicil or a separate instrument the intent must be as clear and unequivocal as was the original intention to devise and bequeath (34Halsbury's Law of England (2d ed.). The legislature *Page 404 
has prescribed the formalities that must attend a revocation and it has the undoubted power to do so. A will or revocation is valid or invalid as it complies or fails to comply with the statute. Provident Institution for Savings v. Sisters of St.Francis, 87 N.J. Eq. 424; affirmed, sub. nom. ProvidentInstitution for Savings v. Meade, c., 88 N.J. Eq. 349. The common law courts and the ecclesiastical courts in early days were not hampered by statutes and their respective rules in the matter of revocation of a will and testament were a culmination of the views of the judges based upon their experience in probate matters.
In probate matters generally it is the duty of the court to ascertain the intention of the testator. But this must be done in conformity with the controlling statutes. The intention of the legislature may not be disregarded. Courts are powerless to reform wills or revocations and must be guided entirely by what the testator did in the matter. The revocation of the first will in the instant case by appropriate language in the last will was unmistakable. It was express and also implied since it contained an inconsistent disposition of the estate. Likewise was the cancellation or destruction of the last will unmistakable. The insertion of a revocatory clause in the last will was proof to a certainty that the testatrix had then departed from her former intentions in disposing of her estate and had set up a new order of disposition.
Frothingham's Case, 76 N.J. Eq. 331, is an illustration of our rule in the matter of revocation by cancellation. There the testator, his fortune depleted after he had executed his will, decided to eliminate certain annuities that he might better provide for his wife. By horizontal and vertical lines he struck out several bequests in lead pencil. The Orphans Court admitted the will to probate in its altered condition, the canceled parts omitted, holding that to accord with the testator's intention. The adverse claim was that the making of the pencil marks by the testator was not final and that the marks were placed on the will in anticipation of the preparation of a new will. On appeal the Prerogative Court (75 N.J. Eq. 205) likewise considered the issue to be essentially one of fact, that is, the testator's intention, and invoking *Page 405 
the doctrine of "dependent relative revocation" found that the testator intended to change the will but had never carried the change into effect. The Orphans Court was reversed and the will was admitted to probate in its entirety. This court, sharply divided, reversed the Prerogative Court and reinstated the decree of the Orphans Court for the reasons expressed by the Orphans Court Judge, holding that "at the time the testator made the erasures his sole object was to get rid of the clauses that he so canceled and that the notion of having a fair copy (of the altered will) made by a penman * * * were afterthoughts to which controlling significance did not attach. What we wish to emphasize is that in revocations of this nature, there is but one point of time as to which the intent of the testator is to have controlling effect, and that is the time of the doing of the very act that constitutes such revocation. To extend the scope of such inquiry to subsequent periods, however closely related in point of time with the revocatory act, is but to add a new danger to a rule that is already from its inherent nature too much exposed to fraud."
It is apparent then that this method of revocation, by cancellation, depends on the intention of the testator and, further, that it is effectual when done if that be the intention. The case of Randall v. Beatty, 31 N.J. Eq. 643, is cited as a leading case in support of the Mansfield rule in this state. That rule was stated by Chancellor Runyon sitting as Ordinary thus: "The true rule on the subject is that where one will is revoked by another the revocation is testamentary and the revocation of the later will revives the former." It is pointed out that this was the rule up to the time when the English statute, 1Victoria, c. 26, became operative. It is, however, to be noted that while the learned Ordinary concluded his opinion by stating the common law rule as the true rule on the subject that nevertheless he did inquire into the facts and circumstances and pointed out that under the ecclesiastical rule, in the circumstances of this case, the first will was revived because, as he found, it was the intention of the testatrix so to do. In this phase of the opinion he said: "Whether the cause he judged by the rule of the English *Page 406 
common law courts or that of the ecclesiastical tribunal, as those rules were prior to the statute of 1838 (1837 was intended), the will of 1870 (the will first made) is entitled to be admitted to probate."
The Prerogative Court had this question again in Moore's Case,72 N.J. Eq. 371. There was offered for probate a will executed in 1882. Later testator made several wills, the last in 1900. The last will contained an express revocation of all previous wills. The testator, according to the evidence, destroyed this last will with intent to revoke it and the will of 1882 was offered for probate. Chancellor Magie, sitting as Ordinary, refused to admit the first will to probate, holding that there was "no ground upon which an intent to revive could be inferred * * *." He frankly stated that but for the construction placed on the statute,supra, in the Randall Case, he was of the view that a revocatory clause in a will "has no testamentary character and is not a testamentary disposition intended to take effect only at the death of the testator leaving the will unrevoked, but to operate and take effect at once," relying on Pickens v. Davis,134 Mass. 256, and other cited authorities. It is clear that the learned Ordinary felt restrained by the decision in Randall v.Beatty, supra; he pointed to the "admission" of Chancellor Runyon to the effect that "it must appear * * * from the circumstances surrounding the transaction, that the testator intended to revive the former will" (72 N.J. Eq., p. 374); and his decree denying probate to the first will is rested on failure of evidence that the testator intended to revive it. That case was not appealed to this court.
A third case in which this question was before the Prerogative Court is Diament's Estate, 84 N.J. Eq. 135. The testator executed his will and thereafter a first, second and a third codicil. All instruments were left in the custody of a trust company. He withdrew the third codicil and destroyed it animorevocandi. The will and the first two codicils were admitted to probate. There Vice-Ordinary Leaming briefly reviews the reasoning of the two cases just mentioned and remarks that in one aspect of Moore's Case it cannot be regarded as a repudiation of Randall v. Beatty, supra; but *Page 407 
in the inquiry to ascertain intent, "the Moore Case appears to have made the ecclesiastical rule the basis of the decision to that extent." The learned Vice-Ordinary decided the DiamentCase largely on the testator's manifest intention when he destroyed the third codicil with intent to revoke it, but he points out that the common law rule, that a revocation, express or implied, is testamentary, would lead to the same result. TheDiament Case was appealed to this court and the decree affirmed (88 N.J. Eq. 552). In the opinion in this court the late Mr. Justice Swayze pointed out that this was not a case of a revocation of an earlier by a later will and a subsequent cancellation of the later, but rather the simple question of the construction of a will thrice republished, and codicils republished, one of them once and one of them twice. However that may be, the court held that the third codicil, which had been destroyed, must be rejected "even as the cancelled portions of Frothingham's will were rejected" (Frothingham's Case, supra) and that case, in our view was decided solely on the ground of intention.
From the cases examined, supra, we think that the governing principle for deciding this case is to ascertain the intention of the testatrix. Our statutes, supra, provide no direct answer to the question because their prescriptions are intended only to regulate the form and manner of due execution of wills and codicils. The governing principle of intention, we think, establishes a sound policy, which is in harmony with the prevailing opinion in this country.
The testatrix in this case destroyed her last will animorevocandi as this court found, In re Davis, supra. She understood at the time she executed this final will that it revoked all previous wills. She received this advice in answer to a specific question which she addressed to counsel. Her former disposition of her estate was abandoned and a new one set up. Later she abandoned the last disposition by the destruction of the will so providing. It is unreasonable to conclude that her mind reverted to the first plan of disposition. Revocation being what it is, a definite and intentional abandonment of a plan of disposition and the substitution of a new plan, no presumption of revivor ought to be indulged. Compare In re *Page 408 Gould, supra. The proponents of the first will of Mrs. Davis offered no evidence whatever to support the inference that the testatrix intended that the first will should be re-established upon the destruction of the subsequent will. An express revocation by its nature seems to be done for present purposes and out of the normal experiences of life we cannot believe that a testator who presently revokes a will has in mind that something in the future shall determine whether it shall be effectual, unless an intention to revive the will revoked shall be proved.
The decree of the Prerogative Court should be reversed, and the decree of the Orphans Court holding that Mrs. Davis died intestate should be reinstated.
For affirmance — DONGES, J. 1.
For reversal — THE CHIEF-JUSTICE, PARKER, CASE, BODINE, HEHER, PERSKIE, PORTER, COLIE, DEAR, WELLS, RAFFERTY, HAGUE, THOMPSON, JJ. 13.