8 N.J. Super. 6 (1950)
73 A.2d 192
IN THE MATTER OF THE ESTATE OF EMILE PFIZER, DECEASED.
Superior Court of New Jersey, Appellate Division.
Argued April 17, 1950.
Decided May 8, 1950.
*7 Before Judges JACOBS, DONGES and BIGELOW.
*8 Mr. Herman G. Vorburger argued the cause for exceptants-appellants (Messrs. Hopkins, Vorburger & Dickson, attorneys).
Mr. Thomas J. Markey argued the cause for respondents, Albert A. Teeter and National City Bank of New York, etc., and William Huck, Jr.
Mr. Harrison F. Durand argued the cause for respondent, Sydney G. Soons (Mr. Sydney G. Soons, attorney pro se).
The opinion of the court was delivered by BIGELOW, J.A.D.
This is an appeal from a judgment of the Somerset County Court, allowing commissions to the executors of the will of Emile Pfizer, deceased, and counsel fees to their attorneys.
The decedent died July 31, 1941, a resident of Somerset County, leaving an estate that was inventoried at $2,815,832. As of August 1, 1942, the executors filed their first intermediate account and the same was passed by a decree of the Orphans' Court which awarded to the executors commissions of $85,272, being 3% on the amount of corpus coming to their hands to be administered, and allowed to their counsel, Mr. William Huck, Jr., a fee of $50,000. The executors' second and final account was filed in July, 1949, and showed additional corpus receipts of $94,754, being gains from the sale or redemption of securities. The court approved the account and allowed additional commissions on corpus of $61,982, and fees of $75,000 to Mr. Huck and $35,000 to Mr. Sydney G. Soons, counsel in New York tax matters. It is from the allowances on the final accounting that the appeal is taken.
Last winter, the respondent moved to dismiss the appeal on the ground that it was not taken within time, and the appellants responded by moving that their notice of appeal be considered as filed nunc pro tunc. Decision on the motions was deferred until the hearing of the appeal on the merits. The judgment of the County Court was entered November *9 18, 1949, and notice of appeal was served 40 days thereafter on December 28th. But the notice was not filed until Thursday, January 5, 1950, 48 days after the entry of the judgment. Rule 1:2-4(a) provides: "Where an appeal is permitted, it may be taken in any cause by serving a copy of a notice of appeal upon the attorney for the respondent and filing the notice in duplicate with service acknowledged on one copy, or with an affidavit of service annexed thereto, with the court from which the appeal is being taken." Rule 4:2-4 enacts that the provisions of Rule 1:2-4 shall apply to appeals to the Appellate Division. Neither of the rules cited limits the time within which an appeal may be taken.
Rule 1:2-5 provides: "Where an appeal is permitted, it shall be taken to the appropriate appellate court within the following periods of time after the entry of the judgment, order or determination appealed from: * * * (b) Final judgments of the county courts or trial divisions of the Superior Court in civil causes, 45 days * * *."
Rule 4:2-5 makes the time provided for in Rule 1:2-5 applicable to appeals to the Appellate Division. We are satisfied that both the service of the notice of appeal and the filing of the notice are requisite to complete the appeal; that both these steps should be taken within the period of 45 days, and that failure to file the notice within time ordinarily requires a dismissal of the appeal. In re Horton, 1 N.J. 571 (1949); Winberry v. Salisbury, 5 N.J. Super. 30 (App. Div. 1949).
But the able lawyer who had charge of taking the appeal in this cause understood otherwise. He found in Rule 3:5-5 that papers which are served must be filed within 10 days thereafter. This rule, like all rules in Part III, seemed to apply to all divisions of the Superior Court, including the Appellate Division. Rule 3:1-1. He concluded that while service of the notice of appeal must be taken within 45 days, the notice might be filed any time within 10 days after service. Although, as stated above, we disagree with his conclusion, we consider it at least plausible. There also appears to be merit in the appeal; but that subject we will discuss *10 later. And no delay has been caused by failure to file the notice within time.
Clearly this is a case in which discretion should move us to deny the motion to dismiss. But Rules 1:7-9 and 4:1-10 forbid the extension of time for taking an appeal. When time is not extended, the filing is out of time, of course, but is a dismissal mandatory?
The Constitution of 1844 expressly gave an appeal from the Orphans' Court to the Prerogative Court. Art. VI, sec. IV (3). The Legislature could not abridge the jurisdiction of the latter court to review an order of the lower court fixing executors' commissions. Anderson v. Berry, 15 N.J. Eq. 232 (Green, C., 1855). By statute, it was provided that the appeal be demanded (the word used in the original enactment) or taken within 30 days. R.S. 2:31-94. Then in Mount v. Van Ness, 34 N.J. Eq. 523 (1881), Ordinary Runyon refused to dismiss an appeal not taken within the statutory period, when the default was caused by a mistake of the surrogate. Many years later, the Court of Errors and Appeals held that the Prerogative Court had unquestionable power to refuse to dismiss an appeal taken out of time, when equity and justice dictated. In re Casey, 127 N.J. Eq. 101 (1940). And this rule was reiterated in Heise v. Earle, 134 N.J. Eq. 393 (E. & A. 1944).
Our present Constitution not only gives, by Art. VI, sec. V, (2), an appeal to the Appellate Division from the County Courts, but by Art. XI, sec. IV, (3) provides with respect to the Prerogative Court and other former constitutional courts, that "all their jurisdiction, functions, powers and duties shall be transferred to and divided between the new Supreme Court and the Superior Court according as jurisdiction is vested in each of them under this Constitution." In our opinion, the discretionary power of the Prerogative Court over appeals from the probate courts of first instance vested in the Appellate Division. We are satisfied that the Supreme Court, in promulgating the rules cited above, did not destroy our power to entertain an appeal under circumstances *11 like the present. See Mitchell v. White Consolidated, 177 Fed.2d 500 (1949). The whole plan and spirit of the New Jersey court rules forbid an insistence on the letter, when the result will be to deprive a litigant of his substantial rights. The motion to dismiss is denied.
As is usual in large estates, the principal problems related to taxation. The most valuable asset of the estate was stock of Charles Pfizer & Company which decedent held subject to a contract with the other principal stockholder, George A. Anderson. They had agreed that on the death of either, the survivor might buy the stock of the decedent at book value, computed in accordance with a certain formula. Anderson, or rather his assignee, pursuant to the agreement, purchased the stock from the executors June 29, 1942, for $1,916,410. The executors, in their federal estate tax return, filed in September, 1942, valued the Pfizer & Company stock at the sales price. The Treasury Department, however, asserted that the correct valuation of the stock was $2,915,539, and on April 24, 1944, tentatively assessed a deficiency tax of $811,471, based principally on the higher value of the stock, although there was a question of inter vivos trusts involved. There followed prolonged negotiations and eventually the Treasury accepted the executors' view of the value of the stock, reducing the deficiency to $30,028. This sum, on December 24, 1947, the executors paid.
Another difficulty arose from a doubt where testator had his domicile. He certainly was a resident of New York City most of his life, but he apparently considered that he moved his residence to Somerset County in 1936 and thereafter he paid the New York State income tax which is assessed against a non-resident instead of the much larger tax that he would have owed had he been a resident. While the executors accepted this view, the Income Tax Division of New York and the Estate Tax Division both insisted that Pfizer continued to be domiciled in New York until his death; and accordingly in 1943 there were assessed income taxes of $52,967 against decedent for the years 1939, 1940 and 1941, and a tentative *12 estate tax in the sum of $58,523. Three years later, by way of compromise, the representatives of the State offered to waive interest and penalties on the income taxes and to reduce the rate of interest on the estate tax from 10 per cent to 6 per cent. The executors thereupon petitioned the Orphans' Court for instructions and on April 3, 1947, the court announced that the compromises were disapproved. On April 21st, the executors retained Mr. Soons to handle the New York tax matters.
We will not relate the steps taken by Mr. Soons, although we have studied with great care the evidence relating to his efforts, as well as those of Mr. Huck and the executors. Finally, in November, 1947, the Estate Tax Division conceded that decedent was not a New York resident, and the estate tax was reassessed on a nonresident basis in the sum of $233. The executors immediately paid the tax and also they paid Mr. Soons, on account of his services, $10,000. A year later, the Income Tax Division agreed to better the settlement which had been proposed in 1946, by canceling the assesment of the income tax for 1939, amounting to $22,039. This compromise received the necessary approvals and the executors, in February, 1949, paid the income taxes for 1940 and 1941, without interest or penalties. The matter was handled by Huck's New York associates until the spring of 1947, but the most striking results were obtained thereafter by Soons. We consider that a fee of $25,000 is reasonable compensation for his services and reduce his allowance to that figure, in which is included, of course, the sum of $10,000 paid to him in December, 1947.
The threat of the additional federal tax involved a sum of money several times greater than was presented by the New York tax authorities; but it seems not to have consumed as much of the time of counsel. The work on the federal taxes was performed by Huck. Outside his work on taxes, the services mentioned in his affidavit were mostly routine. The fee of $50,000 allowed him on the intermediate accounting was sufficient to care for the minor steps to be taken in finally *13 winding up the estate. We conclude that Huck's fee on the final accounting should be reduced to $50,000, based mostly on the tax matters. That would make his total fee on both accountings $100,000.
The sum of the commissions granted the executors on the two accountings was $147,254, equalling five per cent of the gross estate, the maximum set for the most difficult administration. R.S. 3:11-2. The problems of real difficulty here were the tax matters which were handled by counsel,  with the cooperation of the executors, of course. Commissions totalling three per cent are ample. Cf. In re Bristle, 138 N.J. Eq. 476 (E. & A. 1946); In re Ryan, 138 N.J. Eq. 527 (E. & A. 1946). The corpus commission allowed on the final account will be reduced to $2,843.
Let the judgment be modified in conformity with the foregoing opinion.