WILLIAM STEPHEN COLLOPY, PLAINTIFF-APPELLANT, v.
NEWARK EYE AND EAR INFIRMARY, A NEW JERSEY
CORPORATION, DEFENDANT-RESPONDENT.

Argued February 4, 1958—Decided April 28, 1958.

*Mr. Leonard Rosenstein* argued the cause for the appellant (*Mr. George H. Rosenstein,* attorney).

*Mr. Newton H. Porter, Jr.,* argued the cause for the respondent (*Messrs. Porter & Hobart,* attorneys).

The opinion of the court was delivered by

JACOBS, J. The plaintiff's complaint alleges that he entered the defendant hospital on March 21, 1957 for the purpose of having surgery performed upon his eyes; that after the surgery was completed he remained at the hospital as a post-operative patient and wore protective bandages over his eyes; that on March 28, 1957 he was, through the negligence of the defendant in failing to provide suitable guardrailings, permitted to fall out of bed with great force and with resulting serious injuries; that the defendant delayed in taking X-rays until March 30, 1957 and then negligently informed him that he had not sustained any injuries from his fall and discharged him from the hospital; and that subsequently he was obliged to undergo further hospitalization for the treatment of the injuries sustained in his fall. Before answering, the defendant moved to dismiss the complaint, asserting that since it is a nonprofit eleemosynary corporation (*R. S.* 15:1–1 *et seq.*) it possesses an absolute immunity from any responsibility to the plaintiff for injuries resulting from its alleged negligent conduct. The trial court granted the motion and entered summary judgment in favor of the defendant. Thereafter the plaintiff appealed to the Appellate Division and we certified under *R. R.* 1:10–1(*a*).

The immunity upon which the defendant relies was first declared in our courts in 1925 as a judicial expression of the State's public policy (*D'Amato v. Orange Memorial Hospital,* 101 *N. J. L.* 61 (*E. & A.* 1925)); however, the reasonable demands and expectations of innocent persons who were injured through the fault of others soon brought about a far-reaching exception (*Simmons v. Wiley M.E. Church,* 112 *N. J. L.* 129 (*E. & A.* 1934); *Kolb v. Monmouth Memorial Hospital,* 116 *N. J. L.* 118 (*E. & A.* 1936)) which has been applied by our courts more and more broadly (*Rose v. Raleigh Fitkin-Paul Morgan, &c., Foundation,* 136 *N. J. L.* 553 (*E. & A.* 1948); *Lindroth v. Christ Hospital,* 21 *N. J.* 588 (1956)); and in recent years many of our judges have pointedly suggested that sound concepts of right,

justice and morality require outright rejection of the immunity. See *Lindroth v. Christ Hospital, supra; Lokar v. Church of the Sacred Heart*, 24 *N. J.* 549, 555 (1957); *Benton v. Young Men's Christian Ass'n of Westfield*, 47 *N. J. Super.* 372 (*App. Div.* 1957), certification granted, 25 *N. J.* 498 (1958); *Rafferzeder v. Raleigh, etc., Memorial Hospital*, 33 *N. J. Super.* 19 (*App. Div.* 1954), certification granted 17 *N. J.* 557 (1955); *Woods v. Overlook Hospital Ass'n*, 6 *N. J. Super.* 47 (*App. Div.* 1949). In the case before us the single issue presented by the parties is whether the last vestiges of the judicially declared immunity should at this time be erased.

In *Heaven v. Pender*, [1883] 11 *Q. B.* 503, 509, the court expressed the general rule of negligence in the following well-known language:

> "Whenever one person is placed by circumstances in such a position with regard to another that every one of ordinary sense who did think would at once recognize that if he did not use ordinary care and skill in his own conduct with regard to those circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger."

This common law duty of due care, with tort liability for its breach, prevails generally throughout the law although it occasionally comes into conflict with immunities which must find independent support for their continued recognition in their own historical and social justifications. Historically the immunity of eleemosynary institutions (such as the defendant) has little basis. In *Duncan v. Findlater*, 6 *Cl. & Fin.* 894, 7 *Eng. Rep.* 934 (1839), and *The Feoffees of Heriot's Hospital v. Ross*, 12 *Cl. & Fin.* 507, 8 *Eng. Rep.* 1508 (1846), there were *dicta* by Lord Cotenham supporting the immunity, although neither case involved a tort action for personal injuries resulting from the negligent operation of a nongovernmental eleemosynary institution. In *Holliday v. St. Leonard, Shoreditch*, 11 *C. B.* (*N. S.*) 192, 142 *Eng. Rep.* 769 (1861), the court followed the *dictum* in the *Duncan* case and held the vestry of a parish to be immune from tort responsibility, but this holding was quickly over-

turned (*Mersey Docks Trustees v. Gibbs, L. R.* 1 *H. L.* 93, 11 *Eng. Rep.* 1500 (1866); *Foreman v. Mayor of Canterbury, L. R.* 6 *Q. B.* 214 (1871)), and later English cases have given no recognition to the immunity. See *Hillyer v. The Governors of St. Bartholomew's Hospital,* [1909] 2 *K. B.* 820, 825 (*C. A.*); *Marshall v. Lindsey County Council,* [1935] 1 *K. B.* 516, affirmed [1937] *A. C.* 97.

When in *McDonald v. Massachusetts General Hospital,* 120 *Mass.* 432 (*Sup. Jud. Ct.* 1876), the issue was first presented in the United States, the court held the hospital to be immune from tort responsibility but it relied entirely on the *Holliday* case without recognizing that it had already been overruled. See *Goodhart, "Hospitals and Trained Nurses,"* 54 *L. Q. Rev.* 553, 559 (1938). Other American courts followed *McDonald,* and it was not until after 1942, when Justice Rutledge delivered his devastating opinion in *President and Directors of Georgetown College v. Hughes,* 76 *U. S. App. D. C.* 123, 130 *F. 2d* 810 (*D. C. Cir.* 1942), that a substantial number of them, now fully aware of the historical error and the lack of current utility or justification for the immunity, rejected it *in toto.* See *Bing v. Thunig (St. John's Episcopal Hospital),* 2 *N. Y. 2d* 656, 163 *N. Y. S. 2d* 3, 143 *N. E. 2d* 3 (*Ct. App.* 1957); *Avellone v. St. John's Hospital,* 165 *Ohio St.* 467, 135 *N. E. 2d* 410 (*Sup. Ct.* 1956); *Wheat v. Idaho Falls Latter Day Saints Hospital, Idaho,* 78 *Idaho* 60, 297 *P. 2d* 1041 (*Sup. Ct.* 1956); *Noel v. Menninger Foundation,* 175 *Kan.* 751, 267 *P. 2d* 934 (*Sup. Ct.* 1954); *Pierce v. Yakima Valley Memorial Hospital Ass'n,* 43 *Wash. 2d* 162, 260 *P. 2d* 765 (*Sup. Ct.* 1953); *St. Lukes Hospital Ass'n v. Long,* 125 *Colo.* 25, 240 *P. 2d* 917, 31 *A. L. R. 2d* 1120 (*Sup. Ct.* 1952); *Moats v. Sisters of Charity of Providence,* 13 *Alaska* 546 (*Dist. Ct.* 1952); *Durney v. St. Francis Hospital,* 7 *Terry* 350, 46 *Del.* 350, 83 *A. 2d* 753 (*Super. Ct.* 1951); *Ray v. Tucson Medical Center,* 72 *Ariz.* 22, 230 *P. 2d* 220 (*Sup. Ct.* 1951); *Malloy v. Fong,* 37 *Cal. 2d* 356, 232 *P. 2d* 241 (*Sup. Ct.* 1951); *Haynes v. Presbyterian Hospital Ass'n.,* 241 *Iowa* 1269, 45 *N. W. 2d* 151 (*Sup. Ct.* 1950); *Foster v. Roman*

*Catholic Diocese of Vermont,* 116 *Vt.* 124, 70 *A.* 2*d* 230, 25 *A. L. R.* 2*d* 1 (*Sup. Ct.* 1950); *Tavarez v. San Juan Lodge No. 972, B.P.O.E.,* 68 *Puerto Rico* 681 (1948); *Rickbeil v. Grafton Deaconess Hospital,* 74 *N. D.* 525, 23 *N. W.* 2*d* 247, 166 *A. L. R.* 99 (*Sup. Ct.* 1946). *Cf. Porto Rico Gas & Coke Co. v. Frank Rullan & Associates,* 189 *F.* 2*d* 397 (1 *Cir.* 1951); *Brigham Young University v. Lillywhite,* 118 *F.* 2*d* 836, 137 *A. L. R.* 598 (10 *Cir.* 1941), *certiorari* denied, 314 *U. S.* 638, 62 *S. Ct.* 73, 86 *L. Ed.* 512 (1941); *Tuengel v. City of Sitka, Alaska,* 118 *F. Supp.* 399 (*D. C. D. Alaska* 1954); *Mississippi Baptist Hospital v. Holmes,* 214 *Miss.* 906, 55 *So.* 2*d* 142, 56 *So.* 2*d* 709, 25 *A. L. R.* 2*d* 12 (*Sup. Ct.* 1951); *Nicholson v. Good Samaritan Hospital,* 145 *Fla.* 360, 199 *So.* 344, 133 *A. L. R.* 809 (*Sup. Ct.* 1940); *Gable v. Salvation Army,* 186 *Okl.* 687, 100 *P.* 2*d* 244 (*Sup. Ct.* 1940); *Welch v. Frisbie Memorial Hospital,* 90 *N. H.* 337, 9 *A.* 2*d* 761 (*Sup. Ct.* 1939); *Mulliner v. Evangelischer Diakonniessenverein,* 144 *Minn.* 392, 175 *N. W.* 699 (*Sup. Ct.* 1920). See also *Roland v. Catholic Archdiocese of Louisville, Ky.,* 301 *S. W.* 2*d* 574 (*Ct. App.* 1957); *Brown v. Moore,* 247 *F.* 2*d* 711 (3 *Cir.* 1957), *certiorari* denied, 355 *U. S.* 882, 78 *S. Ct.* 148, 2 *L. Ed.* 2*d* 112 (1957); *Wittmer v. Letts, Iowa,* 80 *N. W.* 2*d* 561 (*Sup. Ct.* 1957); *Stolp v. Arkansas City,* 180 *Kan.* 197, 303 *P.* 2*d* 123 (*Sup. Ct.* 1956); *Annotation, "Immunity of nongovernmental charity from liability for damages in tort,"* 25 *A. L. R.* 2*d* 29 (1952).

A highly significant rejection of the immunity was the 1957 decision by the New York Court of Appeals in *Bing v. Thunig (St. John's Episcopal Hospital), supra* [2 *N. Y.* 2*d* 656, 163 *N. Y. S.* 2*d* 11], which held that a hospital was liable for its negligent injury of a patient. The court, after describing the manifold business operations of present-day hospitals, expressed the view that they should fairly "shoulder the responsibilities borne by everyone else"; it rejected the illogical distinctions which had been made in earlier New York decisions and flatly discarded the immunity as being wholly at variance with the needs of today

and with "concepts of justice and fair dealing." In 1956 the Supreme Court of Ohio and in 1953 the Supreme Court of Washington had reached similar conclusions in full opinions which pointed out that since liability insurance was available to charitable institutions they were in no position to urge that their subjection to ordinary tort responsibilities for their wrongdoings might endanger the continuance of their highly worthy endeavors. See *Pierce v. Yakima Valley Memorial Hospital Ass'n., supra; Avellone v. St. John's Hospital, supra.* And in 1950 the Supreme Court of Vermont in *Foster v. Roman Catholic Diocese of Vermont, supra* [116 *Vt.* 124, 70 *A.* 2d 236], rejected the immunity in an opinion which stressed (1) the differences between conditions when the immunity was first judicially embraced and present-day conditions, and (2) the idleness of suggestions that donations would "dry up if the charity is held to respond for its torts" or that charitable donations are given with the expectation that the charity "will not be responsible like other institutions for negligent injury."

Professorial and student writings overwhelmingly oppose the immunity. See 2 *Harper & James, Torts* 1667 (1956); *Prosser, Torts* 784 (2d ed. 1955); *Pound, "Some Thoughts about Stare Decisis,"* 13 *N. A. C. C. A. L. J.* 19, 23 (1954); *Thornton & McNiece, "Torts,"* 32 *N. Y. U. L. Rev.* 312, 327 (1957); *Appleman, "Tort Liability of Charitable Institutions,"* 22 *A. B. A. J.* 48 (1936); *Annotation,* 25 *A. L. R.* 2d 29, 42 (1952), and the numerous law review discussions listed there. Although these writings are free from the restraints of judicial responsibilities, they are worthy of careful consideration for they embody thoughtful and high-minded endeavors to stimulate the movement of our law towards the ever-present goal ʼof obtaining a higher measure of justice for all people. A quarter of a century ago Professor Harper expressed the pertinent policy views which have been long entertained by legal scholars and have been strongly re-enforced by the passage of time:

"The immunity of charitable corporations in tort is based upon very dubious grounds. It would seem that a sound social policy ought,

in fact to require such organizations to make just compensation for harm legally caused by their activities under the same circumstances as individuals before they carry on their charitable activities. The policy of the law requiring individuals to be just before generous seems equally applicable to charitable corporations. To require an injured individual to forego compensation for harm when he is otherwise entitled thereto, because the injury was committed by the servants of a charity, is to require him to make an unreasonable contribution to the charity, against his will, and a rule of law imposing such burdens cannot be regarded as socially desirable nor consistent with sound policy." *Harper, Law of Torts*, § 294, *p.* 657 (1933).

In *D'Amato v. Orange Memorial Hospital, supra,* the plaintiff Elizabeth D'Amato had been a patient at the Orange Memorial Hospital and brought an action for damages against the hospital, alleging that she was injured as the result of the negligence of a nurse employed at the hospital. The court held that the hospital was immune from tort responsibility to the plaintiff; it relied largely on the "leading case" of *Schloendorff v. Society of New York Hospital,* 211 *N. Y.* 125, 105 *N. E.* 92, 52 *L. R. A., N. S.,* 505 (*Ct. App.* 1914), which has since been overruled (*Bing v. Thunig* (*St. John's Episcopal Hospital*), *supra*), and *McDonald v. Massachusetts General Hospital, supra,* which, as has been so often pointed out, followed an overturned English precedent. The only ground advanced in *D'Amato* in support of its holding was the brief statement by Chancellor Walker that "public policy requires that a charitable institution maintaining a hospital be held not liable for injuries resulting to patients through the negligence or carelessness of its physicians and nurses, even if the injured person were a pay patient; payment for board, medical services, and nursing in such case going to the general fund to maintain the charity." See 101 *N. J. L.* at *page* 65. But the Chancellor did not document his expression of public policy, nor did he discuss the underlying reasons for the court's conclusion that it should then declare the immunity. *Cf. Haynes v. Presbyterian Hospital Ass'n., supra* [241 *Iowa* 1269, 45 *N. W.* 2d 154]:

"The law's emphasis generally is on liability, rather than immunity, for wrongdoing. Charity is generally no defense. It is for the legislature, not the courts, to create and grant immunity. The fact that

the courts may have at an early date, in response to what appeared good as a matter of policy, created an immunity, does not appear to us a sound reason for continuing the same, when under all legal theories, it is basically unsound and especially so, when the reasons upon which it was built, no longer exist."

In *Boeckel v. Orange Memorial Hospital*, 108 *N. J. L.* 453 (*Sup. Ct.* 1932), affirmed 110 *N. J. L.* 509 (*E. & A.* 1933), the *D'Amato* case was applied to preclude recovery by Mrs. Boeckel (the mother of a patient at the Orange Memorial Hospital), injured when she fell on slippery hospital steps. But in *Kolb v. Monmouth Memorial Hospital, supra,* the hospital was held under tort liability to Mr. Kolb (a member of the First Aid Squad of the Oakhurst Volunteer Fire Department), who was injured while he assisted in bringing a patient to the hospital. The court declined to apply *D'Amato* on the ground that Mr. Kolb was not a recipient of the hospital's "benefactions"; instead it applied *Simmons v. Wiley M. E. Church, supra,* where a charitable institution was held liable for injuries sustained by Mr. Simmons when he was struck on a public highway by a truck owned by the church and negligently driven by one of its employees. In the *Simmons* case the Court of Errors and Appeals held that the immunity doctrine announced in *D'Amato* must be confined to instances where the injured person is a so-called "beneficiary" of the charity, and may not be extended to instances where the person injured is a so-called "stranger." In *Rose v. Raleigh Fitkin-Paul Morgan, etc., Foundation, supra,* the Court of Errors and Appeals held that a private nurse, caring for a patient at the Fitkin Memorial Hospital, could properly assert a tort claim against the hospital for injuries sustained by her at the hospital premises; she was viewed as a stranger within *Simmons* rather than a beneficiary within *D'Amato*. In *Lindroth v. Christ Hospital, supra,* this court recently sustained a judgment which was recovered by the plaintiff doctor who suffered injuries as the result of the defendant's negligent failure to maintain the elevator at the hospital premises in proper working condition; here again the doctor was viewed as a stranger

within *Simmons* rather than a beneficiary within *D'Amato*.

The lines drawn by the cited New Jersey cases between strangers and beneficiaries were confusing and were somewhat reminiscent of the decisions in New York which formerly differentiated between negligent administrative acts to which liability attached and negligent medical acts to which no liability attached. The New York courts found themselves holding that placing an improperly capped hot water bottle on a patient's body was administrative, whereas keeping a hot water bottle too long on a patient was medical; that administering blood to the wrong patient was administrative, whereas administering the wrong blood to the right patient was medical; that employing an improperly sterilized needle for a hypodermic injection was administrative, whereas improperly administering a hypodermic injection was medical; and that the failure to place sideboards on a bed after a nurse had decided they were necessary was administrative, while failing to decide that the sideboards should be used when the need did exist was medical. See *Bing v. Thunig* (*St. John's Episcopal Hospital*), *supra*. Indeed, in our own State there was one lower court decision (*Fields v. Mountainside Hospital*, 22 *N. J. Misc.* 72 (*Cir. Ct.* 1944)), which adopted the New York view and pronounced an exception to the *D'Amato* doctrine where there had been administrative negligence. But *cf. Jones v. St. Mary's Roman Catholic Church*, 7 *N. J.* 533, 538 (1951), *certiorari* denied 342 *U. S.* 886, 72 *S. Ct.* 175, 96 *L. Ed.* 664 (1951); *Woods v. Overlook Hospital Ass'n.*, *supra; Fair v. Atlantic City Hospital*, 25 *N. J. Misc.* 65, 70 (*Cir. Ct.* 1946).

Professor Scott has extensively discussed three possible grounds which have been suggested for the exemption of charitable institutions from tort liability. See 4 *Scott, Trusts* 2894 (*2d ed.* 1956). The first is that where trust funds are devoted to charitable objects they should not be diverted from those objects and that payment of tort claims would amount to such diversion; but this legalistic view would deny liability in all tort cases, including cases such as *Simmons, Kolb, Rose* and *Lindroth*, where recovery was

allowed by the Court of Errors and Appeals and this Court. The second rests on an alleged waiver by the injured party; but such waiver would be wholly fictitious and a figment of the imagination. The third rests on the inapplicability of the doctrine of *respondeat superior;* but adoption of this approach would deny liability in all tort cases, including cases such as *Simmons, Kolb, Rose* and *Lindroth,* and would seem to disregard the true ground for vicarious liability in our law. See *Harper & James, supra,* at 1669. The New Jersey decisions did not really subscribe to any of the foregoing bases but spoke almost exclusively in terms of the public policy as the judges then saw it. Thus, in the *Boeckel* case Justice Case, sitting in the former Supreme Court, recognized that the diversion of the charity's trust funds, if any, was the same whether the tort claimant was a beneficiary or stranger but, after finding the plaintiff to be a beneficiary, applied *D'Amato* as the State's declaration of public policy. And in the *Kolb* case the court reaffirmed *D'Amato* as limited by *Simmons,* pointing out that it subscribed to "the public policy theory." See also *Bianchi v. South Park Presbyterian Church,* 123 *N. J. L.* 325, 332 (*E. & A.* 1939).

■ It may perhaps be that when *D'Amato* was rendered in 1925 it accurately represented the then prevailing notions of public policy. But times and circumstances have changed and we do not believe that it faithfully represents current notions of rightness and fairness. Due care is to be expected of all, and when an organization's negligent conduct injures another there should, in all justice and equity, be a basis for recovery without regard to whether the defendant is a private charity. We are satisfied that the views recently expressed in the concurring and dissenting opinions in *Lokar v. Church of the Sacred Heart, supra,* and in *Rafferzeder v. Raleigh, etc., Memorial Hospital, supra,* are much closer to the mores and ethical ideals of our times than are those which underlay *D'Amato* several decades ago. In *Lokar* Justice Wachenfeld noted that experiences in other jurisdictions had demonstrated that no calamitous social effects

would result from dissolution of the charitable immunity; that the availability of insurance had obviated any threat that recoveries against charities would seriously deplete their funds and deprive communities of their benefits; and that individuals "should not be forced to suffer the unmitigated and oftentimes crushing burden of injuries wrongfully inflicted merely to continue a judicially inspired immunity long since outdated by the impact of modern times." Similarly in *Rafferzeder*, Judge Jayne pointed to the harshness and injustice of the immunity rule and questioned any present need for it in view of the widespread availability of insurance. It may be noted that charitable institutions in New Jersey have long been under some tort responsibilities for negligent injuries to others (see *Simmons, Kolb, Rose* and *Lindroth, supra*) and presumably have protected themselves by adequate insurance coverage; if the enlargement of their tort responsibilities actually results in additional premiums, that should be considered as but incidental to the rendering of equal justice to all innocent parties who are injured through the negligence of others. While the availability of insurance has undoubtedly been a factor it has by no means been the only one in the strong trend towards rejection of the immunity; the many independently compelling reasons which have been expressed in the recent judicial opinions (*Bing v. Thunig* (*St. John's Episcopal Hospital*), supra; *Pierce v. Yakima Valley Memorial Hospital Ass'n., supra; Avellone v. St. John's Hospital, supra; Noel v. Menninger Foundation, supra; President and Directors of Georgetown College v. Hughes, supra*) have been well summarized in the following manner:

"In addition to the grounds relied upon in rejecting the specific theories in support of the immunity, the courts advocating abandonment of the immunity rule have pointed out that this rule found its way into the law through misconception or misapplication of previously established principles; that it is doubtful whether the administration of justice has ever been well served by the rule; that, in any event, the rule has become outmoded and is an anachronism; that it is a principle of law, as well as of morals, that men must be just before they are generous; that a charity should not be

permitted to inflict injury upon some without the right of redress, in order to bestow charity upon others because the result would be to compel the victim to contribute to the charity against his will; 'that the law's emphasis generally is on liability, rather than immunity, for wrongdoing, and that, in particular, the modern tendency of the law is to shift the burden from the innocent victim to the community at large, and to distribute losses incurred by individuals through the operation of an enterprise among all who benefit by it rather than to leave them wholly to be borne by those who sustained them; that immunity tends to foster neglect while liability tends to induce care and caution; that all persons, organizations, and corporations stand on an equality before the law, and all should be bound alike or excused alike; that the charitable nature of a tort-feasor cannot place it beyond the law applicable to all; and that protection of life and limb by organized society is of greater importance to mankind than any species of charity and is superior to property rights." 25 *A. L. R.* 2d, at *page* 58.

■ The contention has been advanced that even though the former public policy notions have been strongly altered, the elimination of the immunity should be left exclusively to the Legislature. See *McDermott v. St. Mary's Hospital Corporation,* 144 *Conn.* 417, 133 *A.* 2d 608 (*Sup. Ct. Err.* 1957); *Knecht v. Saint Mary's Hospital,* 392 *Pa.* 75, 140 *A.* 2d 30 (*Sup. Ct.* 1958). There is no doubt that within constitutional limits the Legislature may at any time, if it so chooses, explicitly fix the State's policy as to the immunity of charitable institutions from tort responsibilities. But the Legislature has not done so; it has broadly empowered nonprofit corporations to sue "and be sued" (*R. S.* 15:1-4; see *Taylor v. New Jersey Highway Authority,* 22 *N. J.* 454, 467 (1956)); and it has never in any form voiced approval of the immunity of charitable institutions though it has expressly legislated for immunities in other fields. See *Cloyes v. Delaware Tp.,* 23 *N. J.* 324, 331 (1957). In 1955 a bill was introduced (*A* 420) which would have rendered hospitals and similar charitable institutions immune from tort liability to both strangers and beneficiaries for damages *exceeding* $10,000; it was passed in the Assembly but was not acted upon in the Senate and has no bearing here.

■ The unmistakable fact remains that judges of an earlier generation declared the immunity simply because they believed it to be a sound instrument of judicial policy which would further the moral, social and economic welfare of the people of the State. When judges of a later generation firmly reach a contrary conclusion they must be ready to discharge their own judicial responsibilities in conformance with modern concepts and needs. It should be borne in mind that we are not dealing with property law or other fields of the law where stability and predictability may be of the utmost concern. We are dealing with the law of torts where there can be little, if any, justifiable reliance and where the rule of *stare decisis* is admittedly limited. See *Pound, supra,* 13 *N. A. C. C. A. L. J.* at 22; *Seavey, Cogitations on Torts,* 68 (1954); *Cowan, "Torts,"* 10 *Rutgers L. Rev.* 115, 119 (1955). Dean Pound has had this to say as to the applicability of the rule of *stare decisis* in the particular situation before us:

"Again *stare decisis* has no legitimate application to doctrines of the law of torts built upon a mistaken foundation persisting in the books after that foundation has been undermined, which are out of accord with general principles recognized today, so that if they are rejected the general law is clarified rather than unsettled. Such, for example, is the doctrine of immunity of charitable hospitals and like institutions. This immunity for wrong ran counter to general principles of law. In this country it was based upon *dicta* in English cases which were rejected in England before taken over in the United States. It has been given up by the courts in twenty states but is adhered to still in twenty-six. Anomalies of this sort ought not to be protected by *stare decisis.*" 13 *N. A. C. C. A. L. J.,* at 23.

See also Judge Fuld's comments in *Bing v. Thunig (St. John's Episcopal Hospital), supra* [2 *N. Y. 2d* 656, 163 *N. Y. S. 2d* 11]:

"The rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing. It should be discarded. To the suggestion that *stare decisis* compels us to perpetuate it until the legislature acts, a ready answer is at hand. It was intended, not to effect a 'petrifying rigidity,' but to assure the justice that flows from certainty and

stability. If, instead, adherence to the precedent offers not justice but unfairness, not certainty but doubt and confusion, it loses its right to survive, and no principle constrains us to follow it. On the contrary, as this court, speaking through Judge Desmond in *Woods v. Lancet*, 303 *N. Y.* 349, 355, 102 *N. E.* 2d 691, 694, 27 *A. L. R.* 2d 1250, declared, we would be abdicating 'our own function, in a field peculiarly nonstatutory,' were we to insist on legislation and 'refuse to reconsider an old and unsatisfactory court-made rule.' "

We find no merit in the defendant's contention that "this Court may not constitutionally overturn the immunity doctrine." New Jersey's *Constitution of* 1776 provided that the common law of England (as well as so much of the statute law) as was practiced in the colony should remain in force until altered by the Legislature (*Art.* XXII) and the *Constitution of* 1844 provided that the common law (and statute laws) shall remain in force until they expired by their own limitation or were altered by the Legislature (*Art.* X, *par.* 1). There were provisions comparable to these in the constitutions of the other colonies but they were wisely construed as not perpetuating common law holdings which were deemed unsuitable to changed and changing local conditions. See *Hall, "The Common Law: An Account of Its Reception in the United States,"* 4 *Vand. L. Rev.* 791, 805 (1951).[1] The common law has always had the inherent

---

[1] Hall summarizes the cases as follows:

"* * * a review of the cases shows that no matter what the wording of the reception statute or constitutional provision of the particular state, the rule developed, which was sooner or later to be repeated in practically every American jurisdiction, that only those principles of the common law were received which were applicable to the local situation.

Most of the cases which refuse to apply English common-law precepts, do it on the basis that such rules are inapplicable because of fundamental differences between England and America in Governmental structure, basic statutory policy, social conditions, economic status, or geographic and climatic conditions. Several theories have been advanced in order to justify the departures from admitted common-law rules. One manner in which it has been done has been to advance the hypothesis that it was the common law we adopted and not English decisions. This theory that there is an abstract

capacity to develop and adapt itself to current needs; indeed, if this were not true it would have withered and died long ago rather than have grown and flowered so gloriously. In 1852 Justice Elmer aptly pointed out that one of the excellencies of the common law system is "that it is not so inflexible as a statute, but may be modified from time to time, as circumstances require." *Bell v. Gough*, 23 *N. J. L.* 624, 657 (*E. & A.* 1852). Acting on this enlightened approach in 1933 the Court of Errors and Appeals in *Loudon v. Loudon*, 114 *N. J. Eq.* 242, 252 flatly rejected a long standing common law doctrine upon the current view that "it leads to the suppression of truth and the defeat of justice." And in *Heise v. Earle*, 134 *N. J. Eq.* 393, 402, the Court of Errors and Appeals in 1944 took a similar course,

---

common law as distinguished from the decisions themselves is rather difficult for a realist to understand, although it is analogous to Blackstone's view that courts can only discover or declare the law and that their decisions are merely evidence of what the law is rather than the law itself. Another technique has been that of saying that it is a principle of the common law itself that when the reason for the rule no longer exists, the rule also ceases. Thus the judges using this reasoning abandon a common-law principle by purporting to follow the common law. The maxim that when the reason for a rule ceases to exist, the rule also fails has been dignified by a Latin counterpart: *cessante ratione legis cessat et ipsa lex.* Other courts have not felt it necessary to justify on theoretical bases departures from earlier common-law principles, but simply state quite frankly that only that part of the common law has been adopted which is in harmony with the spirit and genius of our institutions."

See *Seeley v. Peters*, 5 *Gilm.* 130, 142, 10 *Ill.* 13 (*Sup. Ct.* 1848); *Marks v. Morris*, 4 *Hen. & M.* *463, 14 *Va.* 463 (*Sup. Ct.* 1809); cf. *Penny v. Little*, 3 *Scam.* 301, 304, 4 *Ill.* 301 (*Sup. Ct.* 1841); *Wilford v. Grant*, 1 *Kirby's Rep.* 114, 116 (*Super. Ct. Conn.* 1786); *Morgan v. King*, 30 *Barb.* 9, 13 (*Sup. Ct. N. Y.* 1858); *Noonan v. State*, 1 *Smedes & M.* *562, *573, 5 *Miss.* 562 (*E. & A.* 1844). See also *Pound, The Formative Era of American Law* 7 (1950) citing *Patterson's Laws of New Jersey* 436 (Act of June 13, 1799, § 7 (repealed by *Act of Feb.* 12, 1819, 43 *sess.*, 1 *sec., p.* 25 and *Act of May* 25, 1820, 44 *Sess.*, 1 *sec., p.* 126)) which prohibited the citation of English decisions rendered after July 4, 1776. *cf.* Atwater, "*The First Constitution of the State of New Jersey*," 27 *N. J. L. J.* 305, 309 (1904).

pointing out that the common law as set forth in the earlier decisions of judges is not "an inflexible mould and pattern for our judicial opinion in this state." It was in fair recognition and fulfillment of the foregoing that the *Constitution of* 1947 broadly set forth in its transitional schedule (*Art.* XI, *Sec.* I, *par.* 3) that all law, statutory and otherwise, shall remain in full force until it expires or is superseded, altered or repealed by the Constitution or otherwise. In *State v. Culver*, 23 *N. J.* 495, 503 (1957), *certiorari* denied, 354 *U. S.* 925, 77 *S. Ct.* 1387, 1 *L. Ed. 2d* 1441 (1957), this court, through Chief Justice Vanderbilt, recently held that the term "otherwise" appropriately included not only legislative alterations but also alterations by the process of change "inherent in the common law"; and as to this process the Chief Justice said:

"One of the great virtues of the common law is its dynamic nature that makes it adaptable to the requirements of society at the time of its application in court. There is not a rule of the common law in force today that has not evolved from some earlier rule of common law, gradually in some instances, more suddenly in others, leaving the common law of today when compared with the common law of centuries ago as different as day is from night. The nature of the common law requires that each time a rule of law is applied it be carefully scrutinized to make sure that the conditions and needs of the times have not so changed as to make further application of it the instrument of injustice. Dean Pound posed the problem admirably in his *Interpretations of Legal History* (1922) when he stated, 'Law must be stable, and yet it cannot stand still.' And what has been done in the past is but one of the factors determinative of the present course of our law—a truism which has not gone unrecognized among the great thinkers of the legal profession."

It is not suggested that the immunity was supported by any English decisions prior to the American Revolution (*cf. In re Vince*, 2 *N. J.* 443, 453 (1949)) and, as has already been pointed out, the supporting *dicta* in the later English cases ran counter to general principles of the common law and were very short-lived. When the immunity first appeared in our own State in 1925 it was voiced not as an expression of the English common law but as the State's public policy as the Court of Errors and Appeals then viewed

it. It seems to us beyond question that, absent any definitive legislative public policy, this court has full power to overrule the earlier declaration by the Court of Errors and Appeals either because it was originally erroneous or because it has become unsound in the light of modern conditions. Since earliest days our courts have recognized and discharged the vital responsibility of re-examining questioned decisions whether they be their own or those of their predecessors. See *e. g.*, *Wood v. Malin*, 10 *N. J. L.* 208, 216 (*Sup. Ct.* 1828, per Ewing, C. J.) overruling *Rowland v. Stevenson*, 6 *N. J. L.* 149 (*Sup. Ct.* 1822); *The State v. Northrop*, 18 *N. J. L.* 271, 273 (*Sup. Ct.* 1841, per Hornblower, C. J.) overruling *State v. Conover*, 7 *N. J. L.* 203 (*Sup. Ct.* 1824); *Howell and White v. Burnett*, 20 *N. J. L.* 265, 268 (*Sup. Ct.* 1844, per Nevius, J.) overruling *Van Giesen v. Van Houten*, 5 *N. J. L.* 822 [Reprint* 966] (*Sup. Ct.* 1820); *Boylan ads. Meeker*, 28 *N. J. L.* 274, 293 (*Sup. Ct.* 1860, per Whelpley, J.) overruling *Den v. Vancleve*, 5 *N. J. L.* 589 [Reprint* 695] (*Sup. Ct.* 1819); *Vulcan Detinning Co. v. American Can Co.*, 72 *N. J. Eq.* 387, 401 (*E. & A.* 1907, per Garrison, J.) overruling *Willard v. Denise*, 50 *N. J. Eq.* 482 (*E. & A.* 1892); *Dieckman v. Walser*, 114 *N. J. Eq.* 382, 390 (*E. & A.* 1933, per Heher, J.) overruling *Smith v. Colonial Woodworking Co., Inc.*, 110 *N. J. Eq.* 418 (*E. & A.* 1932); *Saco v. Hall*, 1 *N. J.* 377, 383 (1949, per Oliphant, J.) overruling *Cavanagh v. Hoboken Land, &c., Co.*, 93 *N. J. L.* 163 (*E. & A.* 1919), *Zwickl v. Broadway Theatre Co.*, 103 *N. J. L.* 604 (*E. & A.* 1927), and *Millar v. United Advertising Corp.*, 131 *N. J. L.* 209 (*E. & A.* 1944); *Pennsylvania-Reading Seashore Lines v. Board of Pub. Utility Com'rs.*, 5 *N. J.* 114, 118 (1950, per Vanderbilt, C. J.), *certiorari* denied, *Brotherhood of Railroad Trainmen v. Pennsylvania-Reading Seashore Lines*, 340 *U. S.* 876, 71 *S. Ct.* 122, 95 *L. Ed.* 637 (1950) overruling *O'Connor v. Board of Public Utility Commrs*, 129 *N. J. L.* 263 (*E. & A.* 1942); *Asbury Park Press v. City of Asbury Park*, 19 *N. J.* 183, 199 (1955, per Burling, J.) overruling *Whirl-O-Ball, Inc., v. City of Asbury Park,*

136 *N. J. L.* 316 (*E. & A.* 1947) where Burling, J. had dissented; *State v. Mucci,* 25 *N. J.* 423, 437 (1957, per Heher, J.) overruling *State v. Brooks,* 136 *N. J. L.* 577 (*E. & A.* 1948). The cited cases (which are by no means all inclusive) involved explicit rejections of earlier holdings by coordinate courts and they may readily be supplemented by the many lines of cases which, without any express over-rulings, gradually abandoned outmoded doctrines in favor of more modern concepts. See *e. g., Cloyes v. Delaware Tp., supra,* 23 *N. J.,* at *page* 329; *Taylor v. New Jersey Highway Authority, supra,* 22 *N. J.,* at *page* 463; *Murphy v. Kelly,* 15 *N. J.* 608 (1954); *Taneian v. Meghrigian,* 15 *N. J.* 267 (1954); *Harris v. Mentes-Williams Co., Inc.,* 11 *N. J.* 559 (1953); *Stoffer, "The Supreme Court and Stare Decisis,"* 9 *Rutgers L. Rev.* 1 (1954). This traditional judicial process of change and growth is never ending and is a vital part of the development of the law in all of the English speaking countries. Judge Hand recently found occasion to refer to the "structure indubitably made by the hands of generations of judges, each professing to be a pupil, yet each in fact a builder who has contributed his few bricks and his little mortar, often indeed under the illusion that he has added nothing." *Hand, The Spirit of Liberty* 130 (1952). And earlier, Justice Cardozo had described the process of judging as a phase of the movement forward through the ages which calls for something more of those who play their part in it than imitative reproduction or "the lifeless repetition of a mechanical routine." *Cardozo, The Growth of the Law* 143 (1924).

The primary function of the law is justice and when a principle of the law no longer serves justice it should be discarded; here the law was embodied not in any controlling statute but in a judicial principle of the law of torts; it had no sound English common law antecedents and found its way into American law through a misconception; it runs counter to widespread principles which fairly impose liability on those who wrongfully and negligently injure others; it operates harshly and disregards modern concepts of justice

and fair dealing; it has been roundly and soundly condemned here and elsewhere and the time has come for its elimination by the very branch of government which brought it into our system. Since the dismissal of the plaintiff's complaint was grounded entirely on the defendant's alleged immunity which we now repudiate, the judgment below must be:

Reversed, with direction for a new trial.

HEHER, J. (dissenting). We are concerned here with first principles, the basic elements of the division of the powers of the government "among three distinct branches, the legislative, executive, and judicial," 1947 *State Constitution, Art*. III, *par*. 1, each supreme within its own allotted sphere according to the inherent policy of the plan, a postulate not open to doubt by reason of the specific provision that "No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution"—a principle of representative government designed to secure essential liberty and justice against the excesses of arbitrary power.

The common law of England has a constitutional basis in our jurisprudence. It was provided in the *State Constitution of* 1776, *Section* XXII, "That the common law of England, as well as so much of the statute law, as have been heretofore practiced in this colony, shall still remain in force, until they shall be altered by a future law of the legislature; such parts only excepted, as are repugnant to the rights and privileges contained in this charter; * * *." The 1844 *Constitution* ordained, *Article* X, *Section* I, that "The common law and statute laws now in force, not repugnant to this constitution, shall remain in force until they expire by their own limitation, or be altered or repealed by the legislature." And the 1947 *Constitution, Article* XI, *Section* I, *paragraph* 3, declares that "All law, statutory and otherwise, all rules and regulations of administrative bodies and all rules of courts in force at the time this

Constitution or any Article thereof takes effect shall remain in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise."

A provision such as the last is deemed inclusive of the common law. *Stout v. Keyes,* 2 *Dougl., Mich.,* 184 (*Sup. Ct., 1st Cir.* 1845). As there said, it is "a general principle, that, upon a change of government, laws in force continue until changed or abrogated." In view of the constitutional history, there can be no doubt of the meaning here. See also *Ray v. Sweeney,* 14 *Bush., Ky.,* 1 (*Ct. App.* 1878). Of this, more hereafter.

While adaptable to modern social needs and the complexities of an expanding society, the fundamental principles of the common law remain constituent elements of our law save as modified or superseded by the legislative process. This, by force of the constitutional mandate. And legislation is and has been in New Jersey the exclusive province of the Legislature, the elected branch of the government. "The legislative power shall be vested in a Senate and General Assembly." 1947 *Constitution, Art.* IV, *Sec.* I, *par.* 1; 1844 *Constitution, Art.* IV, *Sec.* I, *par.* 1; 1776 *Constitution, Arts.* V, VI. See *Heise v. Earle,* 134 *N. J. Eq.* 393 (*E. & A.* 1944). The common law and the statutes have equal force, except as the former may be superseded by the latter or may run counter to the *Constitution* or the genius and spirit of our political institutions.

The constitutional judicial power is basically adjudicative, for the protection of public and private rights and interests under the law, and to that end to expound and interpret and apply the laws. The courts declare and effectuate the applicable principles of the common law not superseded by statute or the Constitution itself. The modification of common-law rules of liability comes within the legislative domain. *McQuigan v. Delaware, L. & W. R. Co.,* 129 *N. Y.* 50, 29 *N. E.* 235, 14 *L. R. A.* 466 (*Ct. App.* 1891). There, the question involved was the existence of judicial power to compel the plaintiff in a personal injury action

to submit his person to examination before trial. Denying the power, absent enabling legislation, the court said:

"* * * It is very clear that the power is not a part of the recognized and customary jurisdiction of courts of law or equity. The doctrine that courts have an inherent jurisdiction to mould the proceedings to meet new conditions and exigencies is true, but in a limited sense. They cannot, under cover of procedure or to accomplish justice in a particular case, invade recognized rights of person or property. No court, we suppose, can abrogate an established rule of evidence, as, for example, the rule that hearsay evidence is inadmissible, or the rule of the common law that parties shall not be witnesses, or that interest disqualifies. They may apply existing rules to new circumstances. Nor is it, we conceive, within the power of the court to create remedies unknown to the common law, or institute a procedure not according to the course of the common law. It is most important that courts should proceed under the sanction of an orderly and regulated jurisdiction, and that as little as possible should be left to the discretion of a judge. * * * We think the assumption by the court of this jurisdiction, in the absence of statute authority, would be an arbitrary extension of its powers."

And the Minnesota Supreme Court, Mr. Justice Mitchell speaking, declared:

"* * * It is undoubtedly true that many of the doctrines of the common law had their origin in social or political conditions which have in whole or in part ceased to exist. But this fact alone will not usually justify courts in holding that these doctrines, when once thoroughly established, have been abrogated, any more than it would justify them in holding that a statute had been abrogated because the reason for its enactment had ceased. Any such rule would leave the body of the common law very much emasculated; as, for example, that pertaining to real estate. While, undoubtedly, the common law consists of a body of principles applicable to new instances as they arise, and not of inflexible cast-iron rules, yet where the rules of the common law have become unsuited to changed conditions, political, social, or economic, it is the province of the legislature, and not of the courts, to modify them." *In re Hulett's Estate*, 66 *Minn.* 327, 69 *N. W.* 31, 34 *L. R. A.* 384 (*Sup. Ct.* 1896).

The ultimate sovereignty is in the people, from whom springs all legitimate authority; and the legislative power is the authority vested in their elected representatives to

make laws, and to alter and repeal them. From the first the colonists in America claimed the benefit and protection of the common law; and they claimed as well the benefit of such statutes as from time to time had been enacted in modification of this body of rules; and when the difficulties with the home government arose, it was a source of immense moral power to the colonists that they were able to show that the rights they claimed were conferred by the common law, and that the king and Parliament were seeking to deprive them of the common birthright of Englishmen. *Cooley's Constitutional Limitations* (*8th ed.*), *pp.* 74, 81, 183. The colonists, "upon their emigration from the mother country, brought with them to this state the common law of England, so far is it was applicable to their condition and circumstances here." *Bloomfield v. Brown,* 67 *R. I.* 452, 25 *A. 2d* 354, 141 *A. L. R.* 170 (*Sup. Ct.* 1942).

It is the general rule that where the English common law has been incorporated in the state's jurisprudence, its basic principles thereby adopted, save as modified or overruled by statute, are subject only to constitutional restraints, the inherent limitations of the state's political institutions, and the state's exercise of the legislative power in the mode ordained by the Constitution. The cases are cited in *E. B. & A. C. Whiting Co. v. City of Burlington,* 106 *Vt.* 446, 175 *A.* 35 (*Sup. Ct.* 1934). Said Chief Justice Chipman:

"* * * It is from this source, the common law, that we derive rules and maxims not only for the construction of our statutes, but of the constitution itself; and, with the limitation expressed, it is the rule of property and the security of our rights; and furnishes to the Courts, in all cases, civil and criminal, *a rule of decision.* (Italics are ours.) The Courts can no more deprive a person, prosecuted for a crime, of a common law right, than they can deprive him of a statute or constitutional right; modes of practice merely they may alter, for the more safe and easy attainment of the ends of justice, so that they do not infringe any essential right." *State v. Parker,* 1 *D. Chip. Vt.* 298, 300, 6 *Am. Dec.* 735 (*Sup. Ct.* 1814).

In Vermont, the common law was adopted by statute; and "a rule of decision" means "the law of this state," the "foundation of our jurisprudence, and, except as modified

or repealed by statute, its rules and principles determine the rights of, and prescribe rules of conduct for, all persons, and such rules and principles are to be followed and applied by our courts in all cases to which they are applicable." *E. B. & A. C. Whiting Co. v. City of Burlington, supra.* And see *Commonwealth v. York,* 9 *Metc., Mass.,* 93, 110 *(Sup. Jud. Ct.* 1845); *Horace Waters & Co. v. Gerard,* 189 *N. Y.* 302, 82 *N. E.* 143, 24 *L. R. A., N. S.,* 958 *(Ct. App.* 1907); *Friend v. Childs Dining Hall Co.,* 231 *Mass.* 65, 120 *N. E.* 407, 5 *A. L. R.* 1100 *(Sup. Jud. Ct.* 1918); *Brahmey v. Rollins,* 87 *N. H.* 290, 179 *A.* 186, 119 *A. L. R.* 8 *(Sup. Ct.* 1935); *Strout v. Burgess,* 144 *Me.* 263, 68 *A.* 2d 241, 12 *A. L. R.* 2d 939 *(Sup. Jud. Ct.* 1949).

Under the Maryland Constitution, in this regard not unlike our own, the holding was that intervention by a co-respondent in a divorce suit in order to protect his reputation is not allowable either at common law or in chancery, nor in Maryland for want of statutory sanction. Said the Court of Appeals:

"* * * While there is considerable force in the co-respondent's argument, it is an argument which should be directed to the Legislature, rather than to the Judiciary of the State. This court cannot enact legislation, but can only administer justice according to existing law." *Lickle v. Boone,* 187 *Md.* 579, 51 *A.* 2d 162, 170 *A. L. R.* 156 *(Ct. App.* 1947).

See also *Leland v. Leland,* 319 *Ill.* 426, 150 *N. E.* 270 *(Sup. Ct.* 1925).

The Missouri Supreme Court has held that any change in the common-law rule confining the "dying declaration" hearsay-rule exception to criminal prosecutions for felonious homicide "should be made by the legislature, the law-enacting branch of government, rather than by the judiciary, the law-interpreting branch." *Cummings v. Illinois Central R. Co.,* 364 *Mo.* 868, 269 *S. W.* 2d 111, 47 *A. L. R.* 2d 513 *(Sup. Ct.* 1954). It was there pointed out that Dean Wigmore, protesting that the limitations on the admissibility of dying declarations to homicide cases "are heresies of the

last century, which have not even the sanction of antiquity," nevertheless advocated that the needed changes be accomplished by legislative action. *Wigmore on Evidence* (*3d ed.*), § 1436.

And changes in "common-law fundamentals" cannot be made to rest "upon an inference of the gossamer texture of mere conjecture, as distinguished from implication"; courts "will give full effect to legislative intent to effect such alterations, but the intention must be at least reasonably clear." *Kemerer v. State Farm Mutual Auto Insurance Co.,* 201 *Minn.* 239, 276 *N. W.* 228, 114 *A. L. R.* 173 (*Sup. Ct.* 1937). It was held that the statute there under review was not clear for the reason that "against the backdrop of common law and equity [it] takes on unmistakably the color and displays the substance of a mere change in procedural, rather than substantive, law"; and it is to be presumed that, in enacting a statute, whether civil or criminal in nature, the legislature "did not intend to make any alteration in the common law, unless the language used naturally and necessarily leads to that conclusion"; the "intent to alter [the common law]" must be "clearly expressed." *Bloomfield v. Brown, supra.*

This has long been the rule in New Jersey. A statute in derogation of the common law is to be strictly construed. *Sinnickson v. Johnsons,* 17 *N. J. L.* 129 (*Sup. Ct.* 1839); *State v. Court of Common Pleas,* 1 *N. J.* 14 (1948). A statute "\* \* \* which is claimed to impose a duty or establish a right which was not recognized by the common law will be strictly interpreted to avoid such asserted change." *Carlo v. Okonite-Callender Cable Co.,* 3 *N. J.* 253 (1949).

In England, where the Parliament exercises sovereign authority and its expressed will is the final law, the rule is the same. The essential principle is thus expressed in *Attorney General v. Todmorden Borough Council* (1937), 4 *A. E. L. R.* 588, Goddard, J., for the King's Bench Division:

"* * * Many people, however, may think that the time has come when it is desirable to reconsider this question of the immunity of the council, an immunity which exists at common law. Although the great virtue of the common law is that it can be moulded and developed by the judges so as to be fitted to the requirements, and to the changing requirements, of modern life, with respect either to commerce or to habits of life or to other social matters, yet, where a rule of law has become fixed by decision, it is not open to judges to-day to alter the law in this respect, which has always been the law from its development, and the remedies that are to be found in the legislation."

Upon what reason can the rule be otherwise in New Jersey? The rationale of the majority opinion is that "in recent years many of our judges have pointedly suggested that sound concepts of right, justice and morality require outright rejection of the immunity"; "It may perhaps be that when *D'Amato* was rendered in 1925 it accurately represented the then prevailing notions of public policy," but "times and circumstances have changed and we do not believe that it faithfully represents current notions of rightness and fairness"; and *State v. Culver*, 23 *N. J.* 495, 503 (1957) is cited in support of the thesis that the term "otherwise" in *Art.* XI, *Sec.* I, *par.* 3 of the 1947 *Constitution* includes "not only legislative alterations but also alterations 'by the processes of change inherent in the common law.'" These considerations all involve obvious questions of policy within the exclusive province of the Legislature.

That the principles of the substantive common law integrated into our jurisprudence are, by the imperative command of the Constitution, subject to modification or repeal only by the exercise of the legislative process was affirmed by this court as late as 1954 in *Taneian v. Meghrigian*, 15 *N. J.* 267 (1954).

The immunity of charities from liability for negligence as pleaded here rests largely on the generally accepted principle that a trust fund cannot be rendered liable for breaches of trust by the trustees; this, on the ground that if the trust fund were used to satisfy the damages suffered by recipients of the charity through the negligence of the

agents or servants of the charity, the fund would be diverted to purposes not within the charitable intention of the founders and patrons of the charity, and thus the benevolent object would be subverted. The common good and welfare is deemed the better served by the preservation of the charitable trust fund than by its diversion to the making of compensation for injury to beneficiaries attending the operation of the charity. This is a substantive principle of public policy firmly established in New Jersey, and throughout the country, such in quality as to render its judicial abrogation an intrusion upon the legislative province in disregard of the separation of powers made the basis of our constitutional system of government. *D'Amato v. Orange Memorial Hospital,* 101 *N. J. L.* 61 (*E. & A.* 1924); *Boeckel v. Orange Memorial Hospital,* 108 *N. J. L.* 453 (*Sup. Ct.* 1932), affirmed 110 *N. J. L.* 509 (*E. & A.* 1933). Compare *Simmons v. Wiley M. E. Church,* 112 *N. J. L.* 129 (*E. & A.* 1934). See also *Roosen v. Peter Bent Brigham Hospital,* 235 *Mass.* 66, 126 *N. E.* 392, 14 *A. L. R.* 563 (*Sup. Jud. Ct.* 1920); *Foley v. Wesson Memorial Hospital,* 246 *Mass.* 363, 141 *N. E.* 113 (*Sup. Jud. Ct.* 1923). The principle has general acceptance, particularly as to hospitals of the private eleemosynary class, that is to say, institutions administering a public charity under private auspices. 10 *Am. Jur., Charities,* §§ 144, 146, *et seq.;* 14 *C. J. S. Charities* § 75.

In *Feoffees of Heriot's Hospital v. Ross,* 12 *Cl. & Fin.* 507, 8 *Eng. Rep.* 1508 (1846), the basic doctrine was treated as an immemorial usage of the common law. There, a hospital supported by private charities for the benefit of poverty-stricken boys, among others, was sued for damages for refusing admission to a 16-year-old boy of the given class; and in dismissing the action, thereby reversing the lower court, the House of Lords, by Lord Cottenham, said:

"* * * It is obvious that it would be a direct violation, in all cases, of the purposes of a trust, if this could be done; for there is not any person who ever created a trust fund that provided for

payment out of it of damages to be recovered from those who had the management of the fund. * * *

* * * * * * * *

* * * It would be in vain to search the records of this country for any judgment of a Court, directing trust funds to be applied to any purpose different from that for which they were originally given."

And Lord Campbell, concurring, declared:

"* * * A doctrine so strange as the Court below has laid down in the present case, ought to have been supported by the highest authority. There is not any authority, not a single shred, here to support it. No foreign or constitutional writer can be referred to for such a purpose."

This case was not expressly overruled in *Mersey Docks Trustees v. Gibbs, XI H. L. C.* 685, 11 *Eng. Rep.* 1500 (1866). As to such immunity, there would seem to be an obvious distinction between charitable institutions of the given class and public bodies created by statute, *e. g.*, to provide toll roads and docks, not within the trust-fund principle.

Moreover, the principle here invoked has become embedded in our jurisprudence by the course of judicial decision; and, as an established rule of substantive policy constituting an integral part of the State's common law, unmodified by legislative action, its alteration or repeal is now within the exclusive legislative province. *In re Burtt's Will,* 353 *Pa.* 217, 44 *A. 2d* 670, 162 *A. L. R.* 1053 (*Sup. Ct., Pa.* 1945). The doctrine of *stare decisis* is grounded in the preeminent public policy of achieving uniformity, certainty and stability in the law, the first requisites of an ordered and just system of law defining the rights of person and of property and the correlative obligations and duties; and the course taken here is in disregard of this primary juridical principle. When persons have arranged their affairs on the faith of settled principles of law, it is not the just province of the judiciary to alter the governing rule retroactively and lay the consequent burden of loss upon those who could not have foreseen the change. Here, unlike the same course by the legislative process, this defendant and all other charities

similarly situated will be required to respond in damages from which they were immune when the injury was sustained, a measure that would have unconstitutional implications were it taken by the Legislature. And there are two companion cases ruled by this adjudication.

"A change by statute is only for the future. A change by decision is retrospective, and makes the law at the time of the first decision as it is declared in the last decision, as to all transactions that can be reached by it." *Stockton v. Dundee Manufacturing Co.*, 22 *N. J. Eq.* 56 (*Ch.* 1871). Compare *Swentusky v. Prudential Insurance Co. of America*, 116 *Conn.* 526, 165 *A.* 686 (*Sup. Ct. Err.* 1933), where Chief Justice Maltbie said:

"* * * [The unwritten] law can never be static but it must be everlastingly developing to meet the changing needs of a changing civilization. But if our system of law is to have stability and a measurable degree of certainty, its development must be an orderly process, an accretion to the body of principles which are the outgrowth of past precedents, reasoned out in pursuance of that method of thinking which is the essence of the common law. Merely because it seems to us unjust that a plaintiff situated as is the one before us should not recover, or that 'social desirability' dictates that she should, affords no sufficient basis upon which we may find liability. Unless the application and reasonable development of accepted principles of law justify that recovery, the remedy, if any, rests with the Legislature and not with the courts."

In Connecticut, the common law was not adopted by the Constitution or statute. *State v. Muolo*, 118 *Conn.* 373, 172 *A.* 875 (*Sup. Ct. Err.* 1934).

The immunity policy has had legislative notice; but there has been no adverse action. The House of Assembly adopted May 26, 1955 a bill providing that no hospital or similar charitable institution shall be exempt from liability for damages occasioned by its servants and agents, "except to the extent to which such damages shall amount to more than $10,000.00, together with interest and costs of suit," effective January 1, 1956, "with respect to accidents occurring, and to causes of action arising therefrom, on or after January 1, 1956." There was no action on the measure

by the Senate. And there was no action on another House bill introduced the same day, March 14, 1955, to condition the licensing of convalescent homes, private nursing homes and private hospitals on the provision of indemnity insurance coverage for such negligence of servants and agents "to the extent that such liability is imposed by law." Thus, the Legislature considered the immunity policy and refused to modify the existing law.

And it goes without saying that the availability or procurement of indemnity insurance coverage cannot give rise to liability for negligence or operate as a waiver of the immunity based on the trust-fund doctrine, or where the rule of *respondeat superior* is not applicable to such institutions. *Williams' Adm'x. v. Church Home*, 223 *Ky.* 355, 3 *S. W. 2d* 753, 62 *A. L. R.* 721 (*Ct. App.* 1928); *Piper v. Epstein*, 326 *Ill. App.* 400, 62 *N. E. 2d* 139 (*App. Ct.* 1945); *Greatrex v. Evangelical Deaconess Hospital*, 261 *Mich.* 327, 246 *N. W.* 137, 86 *A. L. R.* 487 (*Sup. Ct.* 1933).

*Art.* XI, *Sec.* I, *par.* 3 of the 1947 *Constitution* is in substance the same as the earlier provision of the 1844 *Constitution*. All law, "statutory and otherwise," then in force, "shall remain in full force until they expire or are superseded, altered or repealed by this Constitution or otherwise." "Or otherwise" does not confer legislative power upon the courts; this is the exclusive function of the Legislature under *Art.* IV, *Sec.* I, *par.* 1. And the policy of continuing the immunity of charities from liability for negligence is now essentially legislative; it is not for the courts to say that, because of "changed times and circumstances," available indemnity insurance, and so on, a policy that "may perhaps" have "accurately * * * represented [the] prevailing notions of public policy" when *D'Amato* was decided in 1925, is now contrary to "current notions of rightness and fairness." In a word, the judicial power is exerted not to correct a judicial decision erroneous at the time it was made, but to effectuate a radical change of public policy toward charities to meet what the court conceives to be new

standards of right dealing—a course of action the Legislature itself has refused to take, presumably after due consideration, and a course contrary to the English concept of judicial power in relation to the common law and rules of law that have become "fixed by decision," as declared in *Attorney General v. Todmorden Borough Council, supra,* decided in 1937.

The proceedings of the 1947 Constitutional Convention reveal only the submission of Amendment 23 to Proposal 1-1 of the Committee on Rights, Privileges, Amendments and Miscellaneous Provisions, offered in these words:

"Mr. President, this provision is wordy—an adaption of a wordy provision in the 1844 *Constitution* which, I might say, fell between the Committee on Rights and Privileges and the Judiciary Committee. I think it's just of a technical nature—continuing all laws—and is necessary to be inserted in this Schedule."

The amendment was adopted without inquiry or debate, *Vol.* I, *p.* 682. Apparently, it is set out verbatim in *Vol.* II, *p.* 1047; the concluding words of the adopted draft, "* * * this Constitution or otherwise," do not appear in the amendment as offered, and there is nothing in the recorded proceedings to indicate their source or intended meaning. There is no discernible difference in meaning. The 1844 *Constitution* continued the "common law" and "statute law" then in force until altered or repealed by the Legislature; and the new terms have the self-same connotation.

Whence comes, I repeat, the power of the court to declare a change in this substantive policy on what it conceives to be moral grounds? Conceding considerations *pro* and *con,* is not the preservation of such philanthropic trusts for the common good an understandable choice of policy? And is not its reason, assessed by current needs, the legislative province? We are not here concerned with the correction of fundamental error in prior adjudications. The new measure is frankly avowed to be a change of basic policy to accord with "modern" views, a juristic concept of what is just and moral and socially desirable. Would it not be the more prudent course, for the salvation of our constitutional

system, the preserving of "the balance of the Constitution," to adhere to the traditional judicial function and leave this essentially legislative question of policy to the popular assembly, the elected representatives of the people?

Said Hamilton, 78th number of the *Federalist* (1 *Federalist and Other Constitutional Papers* 424): "The interpretation of the laws is the proper and peculiar province of the courts"; "if they [the judges] should be disposed to exercise *will* instead of *judgment,* the consequence would equally be the substitution of their pleasure to that of the Legislative body." And Chief Justice Marshall declared: "Judicial power, as contradistinguished from the power of the laws, has no existence. Courts are the mere instruments of the law, and can will nothing." *Osborn v. Bank of the United States,* 9 *Wheat.* 738, 866, 6 *L. Ed.* 204 (1824).

I give full allegiance to the doctrine, of the essence of our organic law, that the common law must yield to the exigencies, conditions and circumstances of our modern society and political and economic institutions which have rendered it obsolete and utterly impracticable; and I realize that, as said by Justice Holmes, *The Common Law, p. 35,* "Every important principle which is developed by litigation is in fact and at bottom the result of more or less definitely understood views of public policy," and "the unconscious result of instinctive preferences and inarticulate convictions, but none the less traceable to views of public policy in the last analysis." But there he speaks of "the paradox of form and substance in the development of the law"—"In form its growth is logical"; yet, on the other hand, "in substance the growth of the law is legislative." This is our constitutional scheme; and the judiciary's allotted sphere is to maintain the balance, just as it restrains excesses of power by the coordinate branches of the government.

I would refer to the eminent treatment lately given the basic principles by Judge Learned Hand in *The Bill of Rights* [Harvard University Law School, Oliver Wendell Holmes Lectures, 1958] and by Professor Corwin in *Court over Constitution* (1957).

And I would direct attention to the lately decided case of *Knecht v. Saint Mary's Hospital*, 392 *Pa.* 75 (*Sup. Ct.* 1958), where the Pennsylvania Supreme Court, Chief Justice Jones speaking, again sustained the eleemosynary immunity principle as "firmly fixed in the law" of the State, so much so that a change in the doctrine "ought to be effected, not by the courts, but by the legislature, which is, of course, the ultimate tribunal to determine public policy." And the Chief Justice stressed the injustice of making the abrogation of the rule retroactive.

I would affirm the judgment.

BURLING, J. (dissenting). With the respect and deference due my colleagues in the majority, I must dissent from their position.

The subject of charitable immunity has been the cause of prolific opinion, judicial and otherwise. It is one upon which there has been and is not only a conflict of decisions among the courts, but also a remarkable diversity of opinion among the courts which agree in their ultimate result as to the reason for so deciding.

The present immunity philosophy prevailing in New Jersey respecting freedom of charitable institutions or projects from liability for negligent action of its servants and agents was first declared by the highest court in this State in 1925 in the case of *D'Amato v. Orange Memorial Hospital*, 101 *N. J. L.* 61 (*E. & A.* 1925). The ensuing New Jersey decisions on the subject have been tabulated in the majority opinion and there is no reason to repeat them here. These decisions were evidence of and formed part of the common law of this State and by virtue of the 1947 *Constitution, Art.* XI, *Sec.* I, *par.* 3, "shall remain in full force [and effect] until * * * superseded, altered or repealed by this Constitution or otherwise." Since the 1947 *Constitution* the present Supreme Court has had one occasion to review the charitable immunity doctrine and it then affirmed the previous declaration. *Jones v. St. Mary's Roman Catholic Church*, 7 *N. J.* 533 (1951), *certiorari* denied 342 *U. S.* 886, 72 *S. Ct.* 175,

96 *L. Ed.* 664. Assuming there is no constitutional restraint against judicially changing the common law principles of this State, still I deem it not the act of wisdom to presently do so with respect to the doctrine of charitable immunity.

New Jersey is only one of the overwhelming majority of American jurisdictions which, since the initial decision in this country in the case of *McDonald v. Massachusetts General Hospital,* 120 *Mass.* 432 (*Sup. Jud. Ct.* 1876), adopted the immunity principle as part of their jurisprudence. It is said by the critics of immunity that the doctrine was erected upon an imaginary pillar of the English law. If that were the sole basis for the immunity rule I have grave doubt whether it would have survived for the length of time which it has. It has proved to be a sturdier edifice than its critics would lead us to believe. The notion that charitable immunity evolved from a mistaken interpretation by the Massachusetts Court of the law of England does not, of course, reach the merits of the problem, nor would I suggest that it is so intended by those who advance it, but at the same time it should not be placed in such a degree of prominence as to obscure the fact that the *ratio decidendi* of charitable immunities rests upon judicial notions of public policy.

Whatever the historical antecedents of the charitable immunity doctrine, it was so well recognized as part of a principle rooted in public policy prevailing in the United States that when the court in the *D'Amato* case, *supra,* declared it be the law of this State, the following terse statement was deemed a sufficient explanation of its basis:

> "In our opinion, public policy requires that a charitable institution maintaining a hospital be held not liable for injuries resulting to patients through the negligence or carelessness of its physicians and nurses, even if the injured person were a pay patient—payment for board, medical services and nursing in such case going to the general fund to maintain the charity." (101 *N. J. L.* at *page* 65)

This statement has been generally understood to mean that it would be contrary to the interests of society that funds dedicated to a charitable use be permitted to be diverted or

diminished by the payment of judgments resulting from the torts of agents, servants or employees of the organization or institution administering the charity where suit is instituted by the beneficiary of the charity.

Another argument, prevalent among many of those opposed to the charitable immunity doctrine, deserves comment. The objection is often heard that the charitable immunity principle is oppugnant to the proposition that one who through fault injures another is liable for the consequences of his wrong. But the attempt on the part of a plaintiff in suing a charity is to impose liability for the personal fault of agents and employees, *i. e.*, vicarious liability. It is not beyond possibility that the original and universal adoption of the immunity doctrine in this country may have stemmed from a policy on the part of the courts that vicarious liability ought to be restrained within the confines of commercial activities and not spread to charitable enterprises. Compare *Restatement of Trusts,* § 402(3) (1935).

Whatever the reason assigned for the immunity principle, and there are several, see *Prosser, Torts* § 109, *p.* 784 *et seq.,* there clearly emerges an underlying principle that charitable organizations need protection from tort liability. Writing in 1916, Baty concluded that the reason for the doctrine of *respondeat superior* is that "the damages are taken from a deep pocket." *Baty, Vicarious Liability,* 154 (1916). The pockets of many charitable institutions were not so deep, and the consequences of a tort liability may well have proved disastrous. At least, it must have been so felt in 1925 when this jurisdiction embraced the immunity rule. A fundamental consideration today is whether conditions have so' changed as to remove the last vestige of a danger. Many think so, but others, equally thoughtful, firmly believe that serious problems will be created for smaller hospitals and other charitable organizations of modest means. Chief Judge Conway dissenting in the case of *Bing v. Thunig,* 2 *N. Y. 2d* 656, 163 *N. Y. S. 2d* 3, 143 *N. E. 2d* 3, at *page 9* (*Ct. App.* 1957), expressed a deep concern over the fate

of smaller institutions. He declared (143 *N. E. 2d* at *page* 9):

> "Very few, if any, voluntary hospitals reach the end of any year without a deficit which has to be made up by its board of directors or by other charitable gifts. This is especially so of small hospitals. In my judgment, the doctrine of the Schloendorff case has justified itself over the years and has enabled voluntary hospitals to survive. That is particularly so in small communities as distinguished from larger cities. We need both the large and small voluntary hospital. The alternative is public hospitals supported by county or State or stock company hospitals operating as businesses organized for profit."

Suffice it to say that there is no proof in the record which deals with the probable consequence of liability upon charitable institutions, large or small. At least until such time as the consequences of overturning the doctrine of immunity are adequately demonstrated, rather than surmised, I would stay my hand. The branch of government fundamentally suited to garner the appropriate facts is the legislature.

The critics of charitable immunity have taken the position that that which the courts have done they can undo and therefore we ought not to wait for legislative action. Sometimes, however, it is easier to do than to undo, and that, I believe, is the case here. There is no exact analogy between creating the charitable immunity doctrine and destroying it. The time lapse between creation and destruction must be weighed in the balance. There has undoubtedly developed over the years a reliance upon the initial determination, which in turn is reflected in the financial structures of charitable institutions. How great this reliance has been is again only a matter for speculation and the facts are not before us. Insurance looms large in the minds of those who would overturn the immunity rule. Are all institutions insured? Are the majority? How many are not? Of those that are not, how many may be liable for torts committed within the past two years? What would be the consequence of imposing insurance rates which reflect liability of those institutions without immunity, upon the financial structure of charities in *futuro*? When the large

amount of recent verdicts are compounded by the possibility of numerous actions against a single institution, the cost of adequate insurance coverage can be easily imagined. In short, the availability of insurance is no certain panacea for the plethora of problems raised, at least not without an adequate factual basis upon which to premise a conclusion. In 1951 insurance was urged upon this court in the *Jones* case, *supra,* as a solution to the inherent difficulties of the problem. The court held that the argument did not warrant a departure from the rule.

The argument is put forth that immunity has been overturned elsewhere without serious adverse effect. But the socially disadvantageous results might not be so immediate or startling in their impact as to come to public attention quickly. Rather, they would take the form of a gradual lessening of services, since the limited resources of charities will have to be diverted from service functions in order to provide for possible liabilities. Institutions do not have to close their doors before the consequences of liability are felt.

The number and diverse nature of charities in this State pose a difficult problem and I choose not to venture on the outcome without persuasive proofs.

I am heartened by the fact that I am not alone in this view. Aside from the dissenting voices where the immunity doctrine has been overturned, a majority of the court in five very recent instances have stood firm against the decisions dissolving the doctrine and have determined the matter is one for legislative action. Kentucky, *Forrest v. Red Cross Hospital,* 265 *S. W. 2d* 80 (*Ct. App.* 1954); Oregon, *Landgraver v. Emanuel Lutheran Charity Board,* 203 *Or.* 489, 280 *P. 2d* 301 (*Sup. Ct.* 1955); Nebraska, *Muller v. Nebraska Methodist Hospital,* 160 *Neb.* 279, 70 *N. W. 2d* 86 (*Sup. Ct.* 1955); Connecticut, *McDermott v. St. Mary's Hospital Corporation,* 144 *Conn.* 417, 133 *A. 2d* 608 (*Sup. Ct. Err.* 1957); and only the other day Pennsylvania, *Knecht v. Saint Mary's Hospital,* 392 *Pa.* 75, 140 *A. 2d* 30 (*Sup. Ct.* 1958).

The New Jersey Courts have an added reason for presently adhering to the principle of *stare decisis*. In 1955 there was introduced and passed in the Assembly of this State a bill which as amended reads as follows:

"An act limiting the exemption of hospitals and similar charitable institutions and organizations from liability for damages occasioned by the negligence of their agents and servants.

BE IT ENACTED BY THE SENATE AND GENERAL ASSEMBLY OF THE STATE OF NEW JERSEY:

1. No hospital or similar charitable institution or organization shall be exempt from liability for damages for the death of, or injury to the person, or for the destruction or damage to the property of, any person, occasioned by the negligence of its agents or servants, except to the extent to which such damages shall amount to more than $10,000.00, together with interest and costs of suit, as the result of any accident and to the extent that any such damages do not exceed said sum, together with interest and costs, every hospital or other charitable institution or organization shall be liable as aforesaid.

The provisions of this act shall not apply to any hospital or institution or organization owned, operated or maintained by the State of New Jersey or any political subdivision of the State.

2. This act shall take effect January 1, 1956, and shall be effective with respect to accidents occurring, and to causes of action arising therefrom, on or after January 1, 1956."

(*Assembly Bill* No. 420, introduced March 14, 1955, and passed in the Assembly May 26, 1955.)

The bill remained in the Senate committee.

The advocates of change urge that legislative inaction in the case of charitable immunity is neutral; that it does not, as in the case of legislative inaction following a judicial construction of a statute, bespeak accord. But that the Legislature of New Jersey is aware of the problem and has chosen to preserve the *status quo* is apparent. The proponent of the bill thought it prudent to place a $10,000 ceiling upon the liability of charities. Here again is manifested the chasm between judicial and legislative action in dealing with a problem. The present court action imposes unrestricted liability. The Legislature may act more flexibly, and as in the instant statute, abrogate immunity, but mitigate the consequence of change according to what they deem the course of wisdom to be.

Until such time as I may be convinced by a firm foundation in fact that the overturn of the charitable immunity doctrine will, weighing all the interests involved, have a socially beneficial effect I would uphold it.

Accordingly I dissent and vote to affirm the judgment from which the appeal has been taken.

*For reversal*—Chief Justice WEINTRAUB, and Justices WACHENFELD, JACOBS, FRANCIS and PROCTOR—5.

*For affirmance*—Justices HEHER and BURLING—2.